THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICKEY Z. GIACOMO, Defendant-Appellant.

Fifth District   No. 5—91—0787

Opinion filed January 25, 1993.

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Gene Gross, State's Attorney, of Pinckneyville (Norbert J. Goetten, Stephen E. Norris, and Johannah B. Weber, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendant, 15-year-old Nickey Giacomo, was convicted of two counts of aggravated arson (Ill. Rev. Stat. 1991, ch. 38, par. 20—1.1) following a stipulated bench trial. Prior to his trial, defendant filed a motion to suppress, alleging that his statements were not voluntary and that he had not knowingly and intelligently waived his rights. The court denied this motion. On appeal, the only issue raised by the defendant is that the court's denial of his motion to suppress was against the manifest weight of the evidence. We affirm for the reasons set forth below.

At the hearing on the motion to suppress, Pinckneyville Chief of Police Thomas A. Denton, Jr., testified that his office investigated a fire in a teacher's bathroom at the high school on February 1, 1991. At the time of this fire, which was intentionally set, school was in session and teachers and students were present. Denton had five suspects for this fire, but the defendant was not one of them.

On February 7, 1991, Officer Denton received a call at approximately 11:50 a.m. regarding a second fire at the high school. Denton was advised that afternoon by the fire marshal's investigator that the fire on the stage in the school auditorium had been intentionally set. As in the previous fire, school was in session and teachers and students were present. The only witness to the fire was Dean Brewer, the school principal, who noticed smoke coming from the auditorium when he was walking across the school parking lot.

Denton began his investigation of the second fire by asking Brewer for a list of students who had received disciplinary action during the previous week. One of the students on the list was the defendant. Denton had been unaware of the defendant prior to this time, so he asked Brewer about the defendant. Brewer advised Denton that the defendant had been caught stealing a pair of pliers from shop class during the past week, for which he had received an oral reprimand.

Denton next checked the students who were on lunch break "B," since students can wander around the school without a pass during lunch break, and since this was the time the fire occurred. Denton discovered that the defendant was on lunch "B," and that this lunch period started with a study hall in the school auditorium.

Denton sought additional information on the defendant after he found that the defendant's schedule provided him with the opportunity to set the fire. Brewer suggested that Denton talk to Mrs. C.K. Longshore for more background information. Mrs. Longshore advised Denton that the defendant came from a "difficult background" and that the defendant might have had prior involvement with the police.

The information provided by Mrs. Longshore prompted Denton to contact Vickie Suttle, a probation officer for Perry County. Suttle told Denton that the defendant was on probation for committing a burglary in Randolph County and that his supervision on probation had been transferred from Randolph County to Perry County.

Denton called the Coulterville police department in Randolph County, and the Coulterville police explained the defendant's burglary charge to him. The Coulterville police also advised Denton that they had charged the defendant with arson in 1988; however, he was never prosecuted for this offense. Denton received this information at about 8 p.m. on February 7, 1991.

Denton interviewed the defendant at 9 a.m. the following day, February 8, 1991, in the third-floor conference room inside the library at the school. The defendant was brought to the conference room by Brewer. Denton stated that at the beginning of the interview, he had

no evidence that the defendant had set the fire in the school auditorium, and so he initially asked the defendant how he became aware of the fire and as to his whereabouts. The defendant told Denton he was in study hall in the auditorium; he went to lunch; and, after lunch, he went out the door onto the football field, where he encountered two other students, one of whom was named Clark. The defendant also told Denton that Brewer entered the lunch room two or three minutes before the defendant left. While talking to the two students, the defendant smelled smoke, and then he saw Brewer and a janitor run up the stairs to the auditorium.

Because there was a 10- to 15-minute discrepancy in the defendant's explanation and in Brewer's statement of events, Denton asked the defendant about this time discrepancy. The defendant appeared "unsettled" by this question, and he began to "squirm" in his chair. Denton told the defendant that he believed the defendant knew "a lot more about this fire." The defendant then admitted that he had gone back to the auditorium after lunch and that he and the "Clark kid" were on the stage and threw matches back and forth. The defendant speculated that one of the discarded matches might have started the fire.

Denton was aware that the "Clark kid" was in class at the time of the fire and was not on lunch "B," so he asked the defendant why Clark was out of class. The defendant did not respond immediately but then admitted to Denton that, after lunch, he went up onto the stage in the auditorium and found a discarded magazine which he lit and placed next to some "flats," *i.e.*, pieces of canvas attached to wooden boards used in plays. The defendant's version of how the fire started matched the point of origin of the fire determined by the fire marshal, and Denton stated that the defendant could know this only if he had set the fire. The defendant also told Denton where the matches were that he used to set the fire and led Denton to where the matches were buried in the ground by a trash barrel.

Denton did not advise the defendant of his rights until after the defendant confessed to setting the fire. After the defendant's admission, Denton took a 10-minute break and verified the defendant's statement. When Denton returned to the conference room, he gave the defendant his *Miranda* rights. Denton took "exceeding care in explaining" these rights to the defendant because he knew the defendant had a speech impediment, because he knew the defendant was classified as "learning disabled," and because an attempt had been made to contact the defendant's parents but they had not responded to the notification. Denton wanted the defendant to understand the

gravity of the situation, and he wanted the defendant to understand his rights. Denton tape-recorded the administering of the defendant's rights and the interview with the defendant which followed. The tape recording and the transcription of the taped interview were admitted into evidence. In Denton's opinion, the defendant understood the questions he was asked.

Denton admitted that he had no knowledge of the defendant's reading comprehension. He also admitted that before the taped interview, he had Brewer get Bradley, the school superintendent, and the defendant made an inculpatory statement with them present. Denton stated that from 9 a.m. to 9:20 a.m., the defendant made no inculpatory statements; from 9:20 a.m. to 9:30 a.m., the defendant made inculpatory statements; from 9:30 a.m. to 10 a.m., the defendant repeated his statements with Brewer and Bradley present; after 10 a.m., Denton checked out the defendant's story and an attempt to contact the defendant's parents was made; and at 10:50 a.m., Denton returned to the conference room, and at 11:02 a.m., he gave the defendant his rights and the defendant signed a waiver form.

Dean Brewer, the principal of the high school, testified that some of the defendant's classes were learning disabled and some were not. Brewer further stated that the defendant had been tested when he was in school in Arkansas and that the results of those tests revealed that the defendant had a full-scale intelligence quotient of 75, which is considered to be in the low average range.

Brewer confirmed that he had told Denton about the pliers episode and that he had given the defendant an oral reprimand. On February 8, 1991, Denton told Brewer that he wanted to interview the defendant first, so Brewer removed the defendant from his classroom and took him to the third-floor conference room. When Brewer removed the defendant from class, he told the defendant the police needed to talk to him since he was a student in the auditorium at the time of the fire. After Brewer delivered the defendant to the conference room, he left. Brewer returned to the conference room when he learned that the defendant had admitted setting the fire of February 7, 1991, and the fire of February 1, 1991. Brewer, along with Officers Denton and Sroka and School Superintendent Bradley, heard the defendant's statement before the taped statement was made. Brewer was also present when the defendant made his taped statement. Brewer stated that Denton gave the defendant his *Miranda* rights and that he also explained the rights to the defendant. Brewer believed that the defendant understood.

On cross-examination, Brewer admitted that the defendant's tests revealed that he has a reading level of a nine-year-old and is functioning at a third- or fourth-grade level. Brewer also stated he attempted to contact the defendant's parents at about 10:10 a.m., but when he called, the defendant's brother said his parents were not home. Brewer told the defendant's brother to tell his parents that it was important and that they should either come to school or call the school as soon as they arrived home. The defendant's parents contacted Brewer after the defendant had been taken to the police station.

The defendant testified that he is 15 years old and is in the ninth grade. The defendant recalled that Brewer removed him from class on February 8, 1991, and that Brewer told him they wanted to talk to him about what happened on February 7, 1991. Brewer took him to the conference room and left him there with the two officers. The defendant described the room as being 10 feet by 10 feet in size, and it had one window and one door, which was kept closed during the interview.

The defendant stated Denton asked him about the fire and, at first, he denied knowing anything; however, the defendant subsequently admitted to setting the fire. After an hour, Denton told the defendant he was going to tape the interview, and after the tape was started, Denton advised him of his rights. The defendant testified that he did not understand his rights, but that he said he understood because he was afraid. The defendant remembered that Denton told him he could leave the interview at any time, but that he did not leave because he "figured he would get into trouble."

The defendant admitted he knew what a courtroom was and what a judge was. He also admitted he had been in court three or four times before. On the other occasions that he had been in court, he had admitted committing the burglaries and had been placed on probation.

On cross-examination, the defendant stated he was telling the truth when he made the taped statement. The defendant admitted that the police did not beat him and were not mean. In fact, the defendant thought Denton was "nice" to him, and he thought the police were trying to explain "things" to him.

At the conclusion of the hearing on the motion to suppress, the State's Attorney stipulated that the defendant was in custody at 9:30 a.m., after his first inculpatory statement was made.

Subsequently, the court entered an extensive order in which it held that the statements made by the defendant prior to being

given his rights should be suppressed, but that the statement made by the defendant after he was given his rights was admissible since the statement was voluntary and since he had knowingly and intelligently waived his rights. As noted previously, the defendant was found guilty of two counts of aggravated arson at a stipulated bench trial and was sentenced to concurrent six-year terms of incarceration in the juvenile division of the Department of Corrections for each count.

On appeal, the defendant argues that his statements were not voluntary and that he did not knowingly and intelligently waive his rights for several reasons. The defendant contends that the defendant was in custody from the beginning of the interview and that his rights should have been given to him from the outset; thus, all of the defendant's statements should have been suppressed. Also, the defendant asserts that because the defendant's parents were not present during the interview, this factor, combined with the place of interrogation and with the defendant's subnormal mentality and young age, militated against the defendant's statements being voluntary and his waiver being knowing and intelligent.

We initially consider the defendant's implication (for he never argues this point outright) that his warned statement was tainted by his unwarned statements and, therefore, none of the defendant's statements were admissible. *Miranda* warnings are required when a defendant is subject to custodial interrogation. (*People v. Acoff* (1989), 188 Ill. App. 3d 208, 544 N.E.2d 96.) Without going into a litany of factors as to when the defendant was in custody in this case, suffice it to say that the State's Attorney stipulated that the defendant was in custody at 9:30 a.m., after he made his first inculpatory statement. The trial court agreed with the State's Attorney and determined that *Miranda* warnings were required at that point, and we agree. Therefore, we must consider whether the unwarned statements made after 9:30 a.m. tainted the defendant's subsequent warned statement.

In *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, the Supreme Court considered this precise issue. In *Oregon*, the Supreme Court stated:

> "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who

has suffered no identifiable constitutional harm." (*Oregon*, 470 U.S. at 307, 84 L. Ed. 2d at 231, 105 S. Ct. at 1292.)

The Supreme Court went on to state:

> "If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Oregon*, 470 U.S. at 309, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.

We note that *Oregon* specifically rejected the "cat out of the bag" argument first raised in *United States v. Bayer* (1947), 331 U.S. 532, 91 L. Ed. 1654, 67 S. Ct. 1394, and the "fruit of the poison tree" doctrine set out in *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, as being applicable in the situation where there is no unlawful arrest, an uncoerced, unwarned confession and then a subsequent warned confession.

Thus, from the foregoing, it is clear that if the unwarned statements were voluntary, then the subsequent warned statement, if also voluntary, was admissible and was untainted by the previous unwarned statements.

Here, the trial court found that the defendant's statements made between 9:30 a.m. and 10:50 a.m. should be suppressed because they were not preceded by the *Miranda* warnings. The court did not state that the unwarned statements were voluntary, but it is a reasonable inference that it believed so, as the court's only basis for excluding the statements was the failure to give the defendant his *Miranda* warnings. In addition, a review of the record reveals that the unwarned statements were voluntary.

Under Federal law, a statement is voluntary unless the confession is causally related to coercive police conduct. (*Colorado v. Connelly* (1986), 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515.) In order for a statement to be voluntary under Illinois law, a defendant's mental ability, familiarity with the English language,

age, education, and experience are among the factors to be considered. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958.) In other words, the totality of the circumstances controls a court's determination. (*Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958.) Further, in the case of a juvenile, the parents' absence during questioning does not automatically render the confession inadmissible, but this omission constitutes another factor to be considered in determining voluntariness. *People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675.

■ In the case *sub judice*, it was clear that the defendant's mentality was in the low average range; however, this factor does not *ipso facto* make his confession involuntary, as the other factors involved revealed the defendant understood the meaning and the effect of his confession. (*People v. Johnson* (1991), 221 Ill. App. 3d 588, 584 N.E.2d 165.) From the transcription of the taped interview, it was clear from the defendant's responses to the questions asked that he understood. Additionally, the defendant had previous experience with the police as he was on probation for the commission of several burglaries. Similarly, the defendant was not questioned at the police station but was at the school the entire time, a nonthreatening atmosphere. The defendant was not unreasonably detained or physically restrained. The defendant made his inculpatory statements after 20 minutes of questioning, a relatively short time for an interrogation. Lastly, the defendant admitted that Officer Denton was "nice" to him. From the lack of coercive police conduct and from the totality of the circumstances, we find the defendant's unwarned statements were voluntary.

■ We next consider whether the warned statements were voluntary and whether the defendant knowingly and intelligently waived his rights before he made this statement. Here, just as the unwarned statements were not coerced, neither were the warned statements. The police did not misrepresent any evidence or trick the defendant in any manner. The defendant was not placed in handcuffs, tied to his chair or physically restrained in any other manner. The same factors previously considered for the unwarned statements are applicable to the warned statement and will not be reiterated here. Thus, the defendant's warned statement was also voluntary.

The next consideration is whether the defendant's warned statement was made after he knowingly and intelligently waived his rights. Whether a defendant knowingly and intelligently waived his rights is determined from the totality of the circumstances and is

decided upon the facts of each case. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958.) For a defendant to knowingly and intelligently waive his rights, he must have the ability to understand the words in the warnings, and at a minimum, he must understand basically what those rights encompass and what their waiver will entail. (*Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958.) In reviewing a trial court's denial of a motion to suppress, due deference must be given to the trial court, as the court assessed the defendant's credibility and demeanor and the relevant facts, and a reviewing court will only overturn the court's decision if it is against the manifest weight of the evidence. *Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958.

■ Here, a recitation of Officer Denton's conscientious advising of the defendant of his rights reveals that the defendant did understand the rights he was waiving. The advisement by Officer Denton was as follows:

"DENTON—*** Nickey, for the record, I'm going to be reading to you a uh a statement of Miranda Rights. Uh, it's a legal form that we use in [the] police department as part of an investigation. But, first, let me ask, are you aware that you are not under arrest?

GIACOMO—Yes.

DENTON—OK. Do you understand that you can get up and walk out of this room any time you want to?

GIACOMO—Yes.

DENTON—And that you're not in handcuffs currently and you're here because you want to be here. Is that right?

GIACOMO—Yes.

DENTON—OK. Uh, let me read the statement to this and anything you don't understand, just ask me. OK? First of all, you have the right to remain silent. Do you understand that? That means you don't have to talk to me if you don't want to. Do you understand that?

GIACOMO—Yes.

DENTON—OK. Secondly, anything you say can and will be used against you in a court of law. Do you understand that?

GIACOMO—Yes.

DENTON—Do you understand what court is?

GIACOMO—Not very.

DENTON—OK. Uh, court is when uh people gather before a judge and they listen to uh testimony or what people have to say about a potential criminal act. Something that...that another person has done wrong. Uh, do you understand that?

GIACOMO—Yes.

DENTON—So, you...you tell me what you think a court is.

GIACOMO—It's where people go to see what happens to them.

DENTON—OK. Do you know what a judge is?

GIACOMO—They tell uh that tells uh...I don't know it too good. Tell uh what happens, what's going to happen to you and stuff.

DENTON—OK. Uh, have you ever been before a judge before, or have you ever seen a judge or talked to a judge?

GIACOMO—Yes.

DENTON—OK. And where was that.

GIACOMO—In uh Chester.

DENTON—OK. Do you remember the judge's name?

GIACOMO—No, sir.

DENTON—OK. But, you do now understand what a...what court is?

GIACOMO—Yeah.

DENTON—And what court of law is?

BREWER—And you realize what you say can be used and this testimony can be used against you in that court before a judge.

GIACOMO—Yes.

DENTON—In other words, what we say today, what you tell me today, I will go to a judge and tell him what you said. Do you understand that?

GIACOMO—Uh-huh.

DENTON—OK. Third thing is, you have the right to talk to a lawyer. Do you know what a lawyer is?

GIACOMO—Yes.

DENTON—What is a lawyer?

GIACOMO—It's a guy that can help you get out of trouble.

DENTON—OK. And you have a right to not only talk to a lawyer, but you have a right to have a lawyer here with you today. Do you understand that?

GIACOMO—Yes.

DENTON—OK. While you're being questioned. Do you understand that?

GIACOMO—Yes.

DENTON—OK. Fourthly, if you cannot afford to hire a lawyer, one will be appointed to represent you before any

question if you wish. Do you know what that means? It means if you want a lawyer, we can get one for you and he can come here and listen to what you have to say today. Do you understand that?

GIACOMO—Yes.

DENTON—OK. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand that?

GIACOMO—Yes sir.

DENTON—In other words, you don't have to talk to me. You're shaking your head yes, but...does that mean yes?

GIACOMO—Yeah.

DENTON—OK.

BREWER—And that's at any time you may answer a question or two and then you may decide not to answer a question, and you have that right at any time to...to say, 'I don't want to say any more.'

GIACOMO—OK.

BREWER—OK. And you're aware of that?

GIACOMO—Yes sir.

DENTON—A waiver of the rights means that when you voluntarily agree to talk to me without a lawyer present and you'll answer whatever questions you want to ask or answer and you have a right not to answer any questions you don't want to answer. But you agree to go ahead and talk with me, is that what you would like to do?

GIACOMO—Yes.

DENTON—OK. Can you read and write?

GIACOMO—A little bit.

DENTON—OK. Uh, I'm going to give you the form I'm reading on, but on the bottom of this form it says 'Waiver of Rights. I read the above statement of my rights and I understand each of those rights—those five points I read to you. Having those rights in mind, I waive them and willfully make a statement.' Now, it's my understanding that you do wish to continue talking with me. Is that correct?

GIACOMO—Yes.

DENTON—OK. Uh, I will ask you to look over the form that I am reading to you and I will also ask if you need any assistance with reading that you ask Mr. Brewer and maybe he can help explain a word or whatever. But you look that over and see if that's about what I read to you on the tape.

BREWER—Why don't you read that out to me.

GIACOMO—You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford...if you cannot afford to hear a lawyer...hire a lawyer...hire a lawyer, one will be pointed to re...repress?...

BREWER—Represent.

GIACOMO—Represent you before any questions if you wish...

BREWER—Now you know what represent...that means he will act in your...

DENTON—Talk for you.

BREWER—Talk for you.

GIACOMO—You can decide at any time to exercise these rights and not answer any questions or make any systems.

BREWER—That's statements.

GIACOMO—Statements.

BREWER—OK. Now you've read those through and we went through them. Is there anything you don't understand about those?

GIACOMO—No, sir."

From this extensive explanation of the defendant's rights to him, it was clear the defendant knowingly and intelligently waived his rights, when considered with all the other factors previously enumerated. Given the totality of the circumstances in this case, we find that the court's denial of the defendant's motion to suppress was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Perry County is affirmed.

Affirmed.

WELCH and RARICK, JJ., concur.