*In re* J.R. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. J.R. *et al.*, Minors, Respondents-Appellants).

First District (3rd Division)   Nos. 1—96—0782, 1—96—0979 cons.

Opinion filed December 4, 1998.

88

Rita A. Fry, Public Defender, of Chicago (Lester Finkle, Assistant Public Defender, of counsel), for appellant J.R.

Herschella G. Conyers, Randolph N. Stone, and Randee J. Waldman, Manish S. Shah, and Andrea B. Miller, law students, all of Edwin F. Mandel Legal Aid Clinic, of Chicago, for appellant T.J.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LEAVITT delivered the opinion of the court:

Petitions for adjudication of wardship were filed against minor respondents J.R., age 10, and T.J., age 11. Following adjudicatory hearings, both respondents were found delinquent for committing first degree murder. Following dispositional hearings, both were adjudged wards of the court and committed to the Department of Children and Family Services (DCFS). DCFS filed motions to transfer respondents to the juvenile division of the Illinois Department of Corrections (JDOC) pursuant to section 3—10—11 of the Unified Code of Corrections (Code) (730 ILCS 5/3—10—11 (West 1996)). These motions were granted, and this appeal followed.

Derrick Lemon, the eight-year-old brother of the victim, Eric Morris, testified that on the evening of October 13, 1994, he was walking with his five-year-old brother Eric when they were approached by respondents, who asked them if they wanted to see their clubhouse. The two brothers followed respondents to an abandoned fourteenth-floor apartment located at 3833 South Langley in Chicago. Eric ar-

rived at the apartment first. The apartment had two windows, one of which was boarded. When Derrick entered the apartment, he saw respondents preparing to throw his little brother out the window. T.J. was hanging Eric out one window while J.R. was removing a wooden board off the other window. Derrick grabbed Eric's arms and managed to pull him back inside the apartment.

J.R., who was standing by one window, then announced, "Look, there's a fight going on," and T.J. ordered Eric to look out the window. T.J. told Eric, "If you don't look I'll hit you in the head with a brick." As Eric went to the window to observe the (nonexistent) fight, both respondents attempted to throw him out the window. T.J. held Eric by his arm while J.R. held him by his waist, together lifting Eric out the window.

At this point, Derrick tried to save his brother by grabbing his arm. T.J. then released his hold on Eric and bit Derrick's finger, causing Derrick also to release his hold on Eric. As Eric fell to his death, Derrick ran down the 14 flights of stairs hoping to reach his little brother before he hit the ground. Minor respondents were arrested in connection with the death of Eric Morris, and both gave statements substantially confirming Derrick's account of his brother's death.

On appeal, only T.J. challenges the legality of his arrest and the use of his postarrest statement against him. The trial court heard the following evidence relating to T.J.'s arrest. Chicago police officer Cynthia Watson testified that on October 13, 1994, at approximately 8:15 p.m., she was on duty with her partner, Ryan Milot, in the vicinity of 3900 S. Vincennes. As they were monitoring a call of a man shot, the officers were flagged down by a woman named Kim Taylor, who pointed to respondents and stated that they might have information concerning a child who had fallen from a window. T.J., who was 11 at the time, and J.R., who was then 10, both approached the squad car. According to Watson, respondents told her they would show her where the boys who were involved in this were, and Watson said "get in the car."

Based upon the information supplied by respondents, the officers went to the apartment of Derrick Lemon and then to that of a fourth boy. With the four boys in the backseat, the officers proceeded to T.J.'s home, according to Watson. There, Watson spoke with T.J.'s mother Sandra while T.J. remained in the squad car. Watson informed her they were bringing her son to the police station because he had some information about a child falling out a window. Watson asked T.J.'s mother if she could meet them at the station, and Sandra agreed.

All four boys were transported to the police station at 51st and Wentworth and turned over to the detectives in Area One. Detective

James Riley talked with one of the boys, Derrick, sometime between 9:30 and 10 p.m. Derrick informed Detective Riley that T.J. and J.R. pushed his brother out the window. Riley then learned both T.J. and J.R. were also at the station. At approximately 10:30 p.m., Derrick viewed and identified both respondents as the individuals who dropped his brother out the window.

■ T.J. argues he was "seized without probable cause" when he entered Watson and Milot's squad car. A person is seized within the meaning of the fourth amendment only when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *People v. Taggart*, 233 Ill. App. 3d 530, 547, 599 N.E.2d 501 (1992). The trial court found no seizure occurred until later at the station when Derrick identified respondents as the ones who killed his brother and respondents were placed under arrest. In reaching its conclusion, the court emphasized that Officers Watson and Milot were flagged down by a citizen and informed that respondents had information concerning Morris' death; that respondents voluntarily approached the squad car and told the officers they would show them where the boys who were involved in Morris' death were; that at that point respondents were considered merely potential witnesses, not suspects; that neither officer exited the squad car, displayed a weapon, or informed respondents they were under arrest; that respondents were not touched, searched, or handcuffed; that while at the station, neither boy was handcuffed and the door to the interrogation room remained open; and that the only reason respondents were not free to go while at the station prior to their arrest was that they could only be released to their parents.

■ We believe the trial court was correct in finding T.J. was not "seized without probable cause" at any time. Examples of circumstances indicative of a seizure include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *People v. Murray*, 137 Ill. 2d 382, 390, 560 N.E.2d 309 (1990); *Taggart*, 233 Ill. App. 3d at 547. As the trial court found, Officers Watson and Milot never threatened or touched the boys, nor did they brandish their weapons. While T.J. makes much of the fact that one or both officers "*told* the two boys to get into the squad car" (emphasis added), the trial court properly remained focused on the context in which this "command" was issued—respondents had approached the officers *and* offered to show them where the boys involved in the Morris murder were. This fact alone distinguishes the present case from all of the cases relied upon by T.J.: *Dunaway v. New York*, 442 U.S. 200, 60 L.

94

Ed. 2d 824, 99 S. Ct. 2248 (1979); *In re J.W.*, 274 Ill. App. 3d 951, 654 N.E.2d 517 (1995); *People v. Sneed*, 274 Ill. App. 3d 274, 653 N.E.2d 1340 (1995); and *People v. Holveck*, 141 Ill. 2d 84, 565 N.E.2d 919 (1990). These cases all involved police actively seeking out, with a singular purpose, particular suspects. That is considerably different from the situation here, with officers on routine patrol being hailed down by a civilian and informed of two apparent witnesses to a crime who were willing to direct them to the perpetrators of that crime. While we do agree with T.J.'s general contention that his young age and limited intellectual ability (evidence of which will be discussed shortly) are both factors to be considered in deciding whether a juvenile may have felt free to terminate an encounter with the police (see *J.W.*, 274 Ill. App. 3d at 958; *Sneed*, 274 Ill. App. 3d at 280-81), we will not presume an arrest has occurred based upon these factors alone.

T.J.'s suggestion to the contrary, the fact that the doors to the police car locked automatically after respondents entered the vehicle does not suddenly convert respondents' offer of assistance into an unjustified seizure. See *Taggart*, 233 Ill. App. 3d at 550 (noting that "[a]lthough defendant was seated in the rear seat of a squad car with doors incapable of being opened from the inside, there [was] no evidence that defendant ever indicated in any manner to the officers present that he desired to be let out"). More troublesome is Officer Milot's arrest report, in which he indicated T.J. was "arrested" at 8:15 p.m. at 3900 S. Vincennes. However, the trial court found, and in this instance we agree, the arrest occurred after 8:15 p.m. T.J. was not handcuffed, fingerprinted, photographed, or charged—the traditional procedures accompanying an "arrest"—until much later in the evening, after Derrick's identification. See *People v. Green*, 179 Ill. App. 3d 1, 12, 535 N.E.2d 413 (1988) (disregarding time of arrest in arrest report, where one detective testified defendant was "in custody" but further testified that he meant merely that "[defendant] was in the police presence in a police facility").

In sum, the record before us supports the trial court's ruling on this issue. Respondents voluntarily informed an adult that they knew the boys "involved" in the murder of Eric Morris, and this person then relayed that information to officers on patrol. There is no indication in the record that the police had any reason to suspect respondents of the crime until they were later identified by Derrick Lemon at the station, and, therefore, there is no basis for concluding Officers Milot and Watson treated respondents other than as potential witnesses. No evidence in the record exists indicating either boy ever informed the police that he no longer wished to assist in their investigation; at no point did either boy tell anyone in authority that he wanted to go

home, get out of the police car, or leave the police station. Admittedly, from the perspective of young boys of "subpar mental ability," the encounter with the police, once initiated, was to some extent inherently coercive. Nevertheless, whether an arrest has occurred also turns upon the actual restraints upon the person (*People v. Fair*, 159 Ill. 2d 51, 66-67, 636 N.E.2d 455 (1994); *Holveck*, 141 Ill. 2d at 95; *Green*, 179 Ill. App. 3d at 11), evidence of which was lacking in this case. Given these principles, we cannot say the trial court's denial of T.J.'s motion to quash his arrest was clearly erroneous. See *People v. Foskey*, 136 Ill. 2d 66, 76, 554 N.E.2d 192 (1990); *People v. Sevier*, 230 Ill. App. 3d 1071, 1082, 598 N.E.2d 968 (1992). Since we have found nothing improper about T.J.'s arrest, his argument that his statement was the product of an illegal arrest and should therefore have been suppressed must necessarily fail as well.

■ T.J. further argues he did not voluntarily waive his *Miranda* rights. In determining whether a defendant's inculpatory statement was voluntarily made, we look to the totality of the circumstances surrounding the making of the statement. *People v. Brown*, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996); *People v. Melock*, 149 Ill. 2d 423, 447, 599 N.E.2d 941 (1992). Voluntariness turns on several factors, including the age, education and intelligence of the accused, the length of the detention and the duration of the questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment. *Brown*, 169 Ill. 2d at 144; *People v. House*, 141 Ill. 2d 323, 376, 566 N.E.2d 259 (1990).

■ In arguing that his statement was not voluntarily given, T.J. first points to what he terms the "lengthy interrogation process" to which he was subjected. Yet T.J.'s own account of his "interrogation" belies his claim that it was "lengthy." Accepting T.J.'s version of events as set forth in his appellate brief, T.J. had "three distinct contacts" with investigators while at Area One: a meeting with Assistant State's Attorney (ASA) Hal Garfinkel and Detectives James Riley and Jerome Doroba, around 10 p.m., which lasted "a few minutes" and involved Garfinkel reading T.J. his rights; a second meeting, lasting "20 to 30 minutes," where T.J.'s oral statement was taken; and a final meeting, again lasting "20-30 minutes," where T.J.'s statement was reduced to writing. Thus, by respondent's own account, he was questioned for at most an hour by investigators. Although respondent was at the station somewhat late at night (see *People v. Brown*, 235 Ill. App. 3d 479, 490, 601 N.E.2d 1190 (1992) (when suspect is a minor, time of day is additional relevant circumstance to be examined in judging voluntariness of a statement)) and may actually have been present at Area One for a total of six hours, we do not think the length of time spent at the

station and the duration of T.J.'s questioning suggest his statement was involuntarily made. See, *e.g., Brown*, 235 Ill. App. 3d at 490-91 (finding length of detention/questioning not indicative of involuntariness where juvenile suspect was subject to interrogations lasting at most 75 minutes of the six midday hours he was in custody prior to a later questioning, noting case was unlike those "in which a confession was deemed involuntary because an accused was subjected to relay teams of interrogators from dusk to dawn").

T.J. also argues a false statement made by ASA Garfinkel to T.J. prior to questioning further undermined the voluntariness of his statement. As the trial court found, and the State concedes, Garfinkel erroneously informed T.J. prior to questioning that he could be tried as an adult. Respondent suggests "T.J. could easily have interpreted the statement to mean that a failure on his part to speak could result in his being tried as an adult." This is speculation. The opposite conclusion—that such an admonition would produce reticence, not garrulousness, in a young suspect—is just as likely. The trial court so concluded, and we agree.

The final prong of T.J.'s attack upon the trial court's finding that his statement was voluntary concerns the absence of T.J.'s mother Sandra at some of the questioning which occurred at Area One. (Sandra was not present when T.J. gave his oral statement but was present when it was reduced to writing.) T.J. correctly notes that since courts scrutinize custodial statements by juvenile suspects with particular care, given the enhanced potential for coercion, additional factors are relevant to the voluntariness inquiry. One additional factor is the presence of a parent or other adult interested in the juvenile's welfare. See *In re V.L.T.*, 292 Ill. App. 3d 728, 736, 686 N.E.2d 49 (1997); *Brown*, 235 Ill. App. 3d at 490. Nevertheless, it is well settled a juvenile has no *per se* right to consult with an adult (*Brown*, 235 Ill. App. 3d at 489), and the fact that Sandra was present when T.J.'s statement was reduced to writing—a fact not challenged by respondent—significantly undermines his argument on this point.

T.J. attacks the trial court's factual finding that ASA Garfinkel "did not *** question [T.J.] concerning the incident until [T.J.]'s mother Sandra Johnson was there." Garfinkel did testify to the contrary. He testified he remembered seeing Sandra at Area One at approximately 11:30 p.m., testimony that the trial court acknowledged was inaccurate. (The evidence at the suppression hearing established that Sandra did not arrive at the station until some time after 1 a.m. and that T.J.'s oral statement was reduced to writing at approximately 1:30 a.m.) However, even if we assume, as respondent contends, that some substantive questioning of T.J. (the taking of his oral statement)

did occur prior to Sandra's arrival, we do not believe that rendered his later written statement, undisputedly taken in her presence, involuntary.

The questioning of T.J. prior to his mother's arrival was brief, lasting only 15 to 20 minutes. The trial court found T.J. was never fingerprinted, handcuffed, or locked in an interrogation room. The court further found there was "absolutely no evidence" respondent was physically or verbally abused prior to making a statement, an allegation raised at the suppression hearing but abandoned on appeal. Significantly, respondent does not contend the police did anything to delay Sandra's arrival at the station (by her own testimony, she received a call to come to the station around 11:45 p.m.), nor did they do anything to keep her from T.J. once she arrived. The trial court specifically found no one at Area One took any action "to prevent [Sandra] from seeing her son. She was not told she could not see him. In fact, she was taken to him immediately [upon her arrival]." That distinguishes the present case from those cases relied upon by respondent, *People v. Knox*, 186 Ill. App. 3d 808, 814, 542 N.E.2d 910 (1989) (noting "[a]t worst, the police purposely precluded defendant's mother from contact with defendant by neglecting to see if defendant's mother had arrived until after such time as defendant had completed his confession"), and *People v. R.B.*, 232 Ill. App. 3d 583, 595, 597 N.E.2d 879 (1992) (following *Knox*, finding it was "undisputed that the police did not attempt to telephone defendant's parents until after defendant incriminated himself").

Respondent counters by asserting that, as a factual matter, his mother's presence had little effect in dispelling the coercion to which he was subjected, given her version of events regarding the taking of the handwritten statement. In doing so, he wades into a factual dispute decided adversely to him by the trial court. Sandra's version of events, disbelieved by the trial court, included being shown papers which, she was told, contained a statement T.J. had given. T.J. attempted to change the statement but was told "he couldn't change the statement around because he already gave *** the statement before [his mother] got there." Sandra further testified T.J. told her "[i]t didn't happen like this" but that she signed it because she was told she had to.

As a reviewing court, we cannot overturn the trial court's credibility determinations unless they are so lacking in evidentiary support that they are manifestly erroneous. *Brown*, 235 Ill. App. 3d at 491. On cross-examination, Sandra admitted her signature and T.J.'s appeared on every page of the statement. She conceded the statement, which someone went over line by line with her son, contained *Miranda* warnings. On redirect, she then claimed the typewritten por-

tion of the statement containing the *Miranda* warnings was not in the statement when they reviewed it. We cannot say the trial court's disbelief of Sandra's testimony was against the manifest weight of the evidence.

In sum, the issue of whether a confession was voluntary is generally a matter for the trial court alone to decide, and the trial judge's ruling will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *Brown*, 169 Ill. 2d at 144. We see no basis for overturning the trial court's voluntariness finding in this case.

■ Respondent next contends that, even if he is found to have voluntarily waived his *Miranda* rights, he did not do so knowingly and intelligently. For a defendant's confession to be admitted at trial, the State must prove by a preponderance of the evidence that the defendant's waiver of his privilege against self-incrimination and his right to counsel was not only voluntary but also that it was knowing and intelligent. See generally *People v. Bernasco*, 138 Ill. 2d 349, 352-61, 562 N.E.2d 958 (1990). Our supreme court has summarized the principles governing knowing and intelligent waiver as follows:

> "To be valid, the waiver must reflect an intentional relinquishment or abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. [Citation.] To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail. The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer. [Citation.]
>
> Whether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experience, and conduct. [Citation.] The mental capacity of a defendant must be taken into consideration in determining whether a waiver was valid, and while mental deficiency, of itself, does not render a statement unintelligent, it is nonetheless a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession given. ***
>
> While an accused may always ' "subjectively deny that he understood the precautionary warning[,] *** [w]hen the issue is raised in an admissibility hearing, *** it is for the court to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning." ' " *In*

re *W.C.*, 167 Ill. 2d 307, 327-29, 657 N.E.2d 908 (1995), quoting *People v. Reid*, 136 Ill. 2d 27, 55 (1990), quoting *Coyote v. United States*, 380 F.2d 305, 308 (10th Cir. 1967). The crucial test to be used in determining whether an accused know- ingly and intelligently waived his rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear understandable warning of all of his rights. *W.C.*, 167 Ill. 2d at 329; *People v. Jones*, 196 Ill. App. 3d 937, 961, 554 N.E.2d 516 (1990); *Coyote*, 380 F.2d at 308.

■ The primary factor upon which respondent focuses in disputing whether he knowingly and intelligently waived his rights is his "borderline intellectual ability." He points to the following evidence in the record. On October 13, 1994, T.J. was repeating the fifth grade at Doolittle Elementary School. School records indicated he received a failing grade in every subject while in the fourth grade. Dr. John Mur- ray, a clinical psychologist affiliated with the Cook County juvenile court's department of clinical services, tested T.J. and found his full- scale IQ to be 76, placing him in the borderline range of intellectual ability. Dr. Murray specifically found T.J.'s "[v]erbal abilities are gen- erally within the Low Average range with particularly low perfor- mance on the vocabulary subtest indicating a limited ability to interact with others using words."

Dr. Diane Stone, a psychologist employed by the board of educa- tion, also testified regarding T.J.'s mental abilities. She found T.J. to have a verbal IQ of 82, a performance IQ of 74, and a full IQ of 76. T.J. was reading at a second-grade level and performing math at a third- grade level. Dr. Stone believed T.J. had a problem understanding oral directions and information, a condition that could be aggravated by stress. Such a condition could be attributable to a deficit in understand- ing or to a failure to pay attention.

Dr. Stone opined that *Miranda* warnings are written at a fifth- or sixth-grade reading level. She testified that in her expert opinion T.J. did not understand the *Miranda* warnings he had been given. She based this opinion on her 12 to 15 interactions with T.J. in the three to four months prior to her testimony. She found T.J. understood and responded appropriately to sentences but if given long, multistep direc- tions, T.J. needed the words changed around. She further stated that if T.J. was given instructions by an authority figure and did not understand them, he would not say he did not understand.

In finding T.J. knowingly and intelligently waived his rights, the trial court relied on a number of factors. The trial court found signifi- cant the fact that ASA Garfinkel had changed the wording of the *Mi- randa* warnings to better help T.J. understand them. Garfinkel testi-

fied that prior to giving respondent his *Miranda* warnings, he first explained to him he was a lawyer working for the police. Instead of using the word "indigent," he explained to T.J. that "if he didn't have any money, if his family didn't have any money, the Court would make sure that he had a lawyer." The trial court noted Garfinkel had been careful not to use the words "interrogation" and "consult" and referred to his conversations with T.J. as "questioning." Given Garfinkel's testimony regarding his simplification of the *Miranda* admonishments—and the trial court's specific reliance on these simplified warnings in its findings of fact—we fail to comprehend the basis for respondent's repeated assertions that "T.J. was read nothing other than the standard *Miranda* warnings."

The trial court found that nothing in T.J.'s conduct during questioning would have indicated he did not understand any of his rights prior to waiving them. ASA Garfinkel testified that he asked T.J., after each right was read to him, whether he understood what each meant, and T.J. responded affirmatively. T.J.'s mother Sandra was present when T.J. reduced his oral statement to writing and at no time indicated she felt T.J. did not understand the rights that were being read to him. See *W.C.*, 167 Ill. 2d at 334 (upholding the trial court's finding that minor's waiver was knowing and intelligent, noting "[n]either W.C. nor his mother stopped the questioner, asked for explanation or indicated that W.C. did not understand"). Garfinkel testified he went over each page of respondent's statement with T.J. and his mother, asking after each page was reviewed whether any corrections needed to be made. If a correction was made, Garfinkel would initial it, with T.J. and his mother initialing it next. In fact, two corrections were made, each initialed by T.J. and his mother. Both signed every page of the statement. Garfinkel testified he observed nothing that would have indicated to him that T.J. did not understand his rights.

Respondent points to the fact that T.J. had difficulty reading his statement along with ASA Garfinkel after Garfinkel had written it down and reviewed it, a fact that has not been contested. The trial court discounted the relevance of T.J.'s reading difficulty, noting Garfinkel had orally, and in great detail, gone over the *Miranda* warnings and the contents of T.J.'s statement with him prior to having him try to read along in review. We agree with the trial court. While relevant in judging whether T.J. knowingly and intelligently waived his rights, a lack of reading skills is not dispositive, where, as here, a thorough oral presentation and explanation of the *Miranda* rights has occurred. (We note that respondent's own expert witness, Dr. Murray, in his report, characterized T.J.'s "ability to attend to auditorily presented information" as a "relative strength" of T.J.'s.)

Nor can we, as respondent suggests, fault the trial court for refusing to accept Dr. Stone's opinion that T.J. did not understand his *Miranda* warnings on the night in question. On cross-examination, Dr. Stone admitted she was never asked to evaluate specifically whether T.J. could understand the individual *Miranda* warnings. She testified that, if she had been, she would have performed two other tests that are used to evaluate an individual's auditory processing. She acknowledged that neither was performed on T.J. The trial court then asked Dr. Stone whether she ever asked T.J. what the words "silent" or "attorney" meant. Dr. Stone testified she had not, and the court then questioned her ability to form an opinion as to T.J.'s ability to understand *Miranda* warnings. The trial court apparently accepted Dr. Stone's numerical assessment of respondent's IQ but rejected her ultimate conclusion that T.J. was incapable of understanding the *Miranda* warnings given by ASA Garfinkel. We find no error here. See *People v. Phillips*, 226 Ill. App. 3d 878, 887-88, 589 N.E.2d 1107 (1992) (upholding trial court's finding of knowing and intelligent waiver and rejecting defendant's argument the trial court improperly ignored his two experts, since the trial court could have agreed with the experts' conclusions that defendant was to some degree mentally retarded and that he had a low IQ but could have disagreed with their conclusion defendant lacked the ability to knowingly and intelligently waive his *Miranda* rights).

Although respondent cites a number of cases that he contends support his position on this issue (see *Bernasco*, 138 Ill. 2d 349; *People v. Giacomo*, 239 Ill. App. 3d 247, 607 N.E.2d 329 (1993); *People v. Higgins*, 239 Ill. App. 3d 260, 607 N.E.2d 337 (1993)), we believe it necessary to discuss only one case, one relied upon by the State and one that, in our view, respondent has been unable to distinguish. In *W.C.*, Dr. Stone (respondent's expert witness in the present case) testified on behalf of a minor 12 years old at the time of his arrest. She found the minor's IQ to be 47 or 48, indicating moderate mental retardation, which translated into a chronological age of six to seven years. A court psychologist agreed with this assessment. Dr. Stone concluded the minor was incapable of understanding his *Miranda* rights on the day he allegedly waived them. *W.C.*, 167 Ill. 2d at 330-31.

The minor himself testified and cast further doubt upon his own ability to knowingly and intelligently waive his *Miranda* rights. Based upon the minor's answers to specific questions geared to test his understanding of the *Miranda* rights, our supreme court in *W.C.* found the minor suffered from "substantial intellectual limitations" which were "apparent from even the cold record." *W.C.*, 167 Ill. 2d at 334. Despite Stone's testimony and various reports that "left little doubt

that W.C. did not possess the ability to understand the words and terms contained in standard *Miranda* warnings, regardless of how he presented himself to the authorities," the supreme court found the minor "might have been able to understand" the simplified *Miranda* admonishments given by an ASA. *W.C.*, 167 Ill. 2d at 335.

The ASA in *W.C.* had explained to the minor that he did not have to talk; she was a lawyer, but she was a lawyer working with the police; she would tell a judge what he told her; and he could have a lawyer to help him if he wanted one, even if he could not afford one. Noting that "[a] trial court sits in a uniquely advantageous position when evaluating a witness' subjective mental capabilities," the supreme court refused to disturb the trial court's finding that W.C. had knowingly and intelligently waived his rights. *W.C.*, 167 Ill. 2d at 335.

We see little difference between *W.C.* and the present case. As in *W.C.*, a somewhat simplified version of *Miranda* warnings was given to the minor. As did the ASA in *W.C.*, Garfinkel began by explaining he was a lawyer working for the police. As in *W.C.*, the minor was informed he could have a lawyer if he wanted one, even if he could not afford one. (In some sense, Garfinkel's explanation was even simpler; he avoided the word "afford" and explained to T.J. that "if he didn't have any money, if his family didn't have any money, the Court would make sure that he had a lawyer.")

Respondent suggests that *W.C.* is distinguishable in that "unlike the present situation, W.C.'s mother accompanied him to the police station and was present during questioning." However, it is undisputed T.J.'s mother Sandra *was* present when ASA Garfinkel was explaining T.J.'s *Miranda* rights prior to taking his written statement, and we think the fact that in *W.C.* the minor's mother may have been with him on the way to the police station, or for a longer period of time preceding the statement, is a distinction without a difference.

Nor do we believe the fact that the minor in *W.C.* had received *Miranda* warnings on two previous occasions, once delaying speaking with police after receiving the warnings, necessarily distinguishes *W.C.* from the instant case. While that factor certainly did favor a finding of a knowing and intelligent waiver, there was considerably more reason to question the validity of the waiver in *W.C.* than in the present case. Notably, the minor's intellect in *W.C.* was significantly more limited than that of T.J. The minor in *W.C.* had an IQ of 47 or 48, functioned academically at the first- to second-grade level, and was for all practical purposes illiterate. Given the supreme court's reluctance to disturb the trial court's finding in *W.C.*, we can hardly justify questioning the trial court's ruling here. In sum, we are simply not prepared to say

the trial court's finding that respondent's waiver of his rights was voluntary, knowing, and intelligent is against the manifest weight of the evidence. See *W.C.*, 167 Ill. 2d at 329; *People v. Reid*, 136 Ill. 2d 27, 56, 554 N.E.2d 174 (1990).

We next address an argument raised by both minors. Both T.J. and J.R. argue their transfer to the JDOC, pursuant to an amendment to section 3—10—11 of the Code (730 ILCS 5/3—10—11 (West 1996)), was improper, inasmuch as the committee that recommended the transfer failed to comply with the Illinois Administrative Procedure Act (5 ILCS 100/1—1 *et seq.* (West 1996)). The facts relevant to the transfer of the minors are as follows. The instant offense occurred on October 13, 1994. Following their adjudications as minors delinquent of first degree murder, both respondents were adjudged wards of the court and committed to DCFS (J.R. on November 14, 1995, and T.J. on November 28, 1995). Due to difficulties experienced by DCFS in attempting to find appropriate facilities in which to place respondents, Anne Studzinski, the juvenile justice administrator for DCFS, convened a joint interagency review committee (IRC) to discuss the minors' placement.

■ Section 3—10—11 of the Code, as amended effective January 1, 1995, established the following role for the IRC in the transfer of juveniles:

"(a) If (i) a minor 10 years of age or older is adjudicated a delinquent under the Juvenile Court Act *** and placed with the Department of Children and Family Services, (ii) it is determined by an interagency review committee that the Department of Children and Family Services lacks adequate facilities to care for and rehabilitate such minor and that placement of such minor with the Department of Corrections, subject to certification by the Department of Corrections, is appropriate, and (iii) the Department of Corrections certifies that it has suitable facilities and personnel available for the confinement of the minor, the Department of Children and Family Services may transfer custody of the minor to the Juvenile Division of the Department of Corrections ***.

The interagency review committee shall include a representative from the Department of Children and Family Services, a representative from the Department of Corrections, and an educator and a qualified mental health professional jointly selected by the Department of Children and Family Services and the Department of Corrections. The Department of Children and Family Services, in consultation with the Department of Corrections, shall promulgate rules governing the operation of the interagency review committee pursuant to the Illinois Administrative Procedure Act." 730 ILCS 5/3—10—11 (West 1996).

The IRC convened in the present case consisted of Velma Williams, a clinical social worker from DCFS; Joanne Perkins, the Deputy Director of the JDOC; Dr. Barbara Williams, senior center associate at the University of Chicago Center for School Improvement; and Dr. Eugene Griffin, senior public service administrator for the Illinois Department of Mental Health. The IRC met on December 4, 15, 18, and 27. The committee recommended transfer of the minors based upon its conclusion that DCFS did not have adequate facilities for the minors and that placement with the JDOC was appropriate.

■ Respondents contend the Administrative Procedure Act was violated when the IRC acted without first promulgating rules. They point to that portion of section 3—10—11 stating DCFS "shall promulgate" rules governing the operation of the IRC. See 730 ILCS 5/3—10—11(a) (West 1996). None of the parties to this appeal contest the fact the IRC made its final recommendation on December 27, 1995, and that rules were not promulgated by the IRC until January 2, 1996, with an effective date of December 29, 1995.

We first note that the mandatory nature of this statutory provision is debatable. Regarding the use of the word "shall," the appellate court has held:

> "Whether a statutory provision is directory or mandatory depends on the legislative intention, to be ascertained from the nature and object of the act and the consequences which would result from any given construction. [Citation.] While use of the word 'shall' is generally regarded as mandatory, the term does not have a fixed or inflexible meaning and can be construed as merely directory, depending on the legislative intent. [Citation.] It has often been recognized that the word 'shall' is intended to have a directory meaning where the provision merely directs a manner of conduct for the guidance of public officials or where the section is designed to secure order, system, and dispatch in proceedings. However, even in such circumstances, the term will be given a mandatory meaning if the provision also contains negative language which prohibits performance of the acts required if they are not done in the manner designated or if an individual's rights will be injuriously affected by a failure to abide by the provision's direction. [Citations.] Thus, the word 'shall' may be held to be merely directory only where no advantage is lost, no right is destroyed, and no benefit is sacrificed, either to the public or to any individual [citation] or where the statute does not provide sanctions for failure to comply with the provision in dispute." *Stull v. Department of Children & Family Services*, 239 Ill. App. 3d 325, 332-33, 606 N.E.2d 786 (1992).

Based upon the preceding, it appears to us that the language of

section 3—10—11 regarding the promulgation of rules for the IRC is directory rather than mandatory. That section does not contain "negative language" which prohibits the IRC from making a transfer decision unless done "in the manner designated." Nothing in the language of the amended section suggests the IRC's power to act is conditioned upon the promulgation of rules. See *Board of Education of Community High School District No. 94 v. Regional Board of School Trustees*, 242 Ill. App. 3d 229, 234-35, 613 N.E.2d 754 (1993) (rejecting argument that regional board of school trustees' decision was void from the outset because board failed to adopt rules of practice prior to administrative proceedings, since board's power arises from School Code (105 ILCS 5/1—1 *et seq.* (West 1992)), not rules). This is consistent with the general rule that administrative agencies may establish standards of conduct in applying statutes either by rulemaking or adjudication, a decision left to the informed discretion of the agency. See *Riverboat Development Corp. v. Illinois Gaming Board*, 268 Ill. App. 3d 257, 260, 644 N.E.2d 10 (1994) ("An agency need not promulgate rules before it can adjudicate facts to implement its statutory mandate"); *Boffa v. Department of Public Aid*, 168 Ill. App. 3d 139, 146, 522 N.E.2d 644 (1988) ("Specific standards are desirable but not required to justify an agency's [application of a statute] [citations], even where the question may be one of first impression in an adjudicative context [citation] and, where appropriate, an agency may announce new principles or policies without resorting to formal rulemaking"); *Kaufman Grain Co. v. Director of the Department of Agriculture*, 179 Ill. App. 3d 1040, 1047, 534 N.E.2d 1259 (1988) ("When an administrative agency interprets statutory language as it applies to a particular set of facts, adjudicated cases are a proper alternative method of announcing agency policies"). Moreover, the fact that the IRC could issue nothing more than a recommendation, which the trial court was apparently free to accept or reject (see 730 ILCS 5/3—10—11(a)(1) (West 1996) (DCFS may transfer custody of minor to the JDOC if "the juvenile court that adjudicated the minor a delinquent orders the transfer after a hearing with opportunity to the minor to be heard and defend")), suggests there is little reason to require the promulgation of rules before the IRC could "act" (*i.e.*, recommend).

Regardless, we fail to see how the result in this case would be any different had the IRC adopted its rules prior to, and not after, its decision to recommend placement of the minors in the JDOC. The State and the Attorney General make persuasive arguments regarding respondents' failure to show how they were prejudiced by the procedures employed by the IRC prior to adopting rules and, in general, the difficulty of fashioning a remedy if we did find a violation of the Administrative Procedure Act here.

As the trial court found, the IRC, in reaching its recommendation, essentially followed the rules that were eventually promulgated. These rules (there are only six) are contained in the record and do little more than reiterate the standard—already set forth in section 3—10—11—for transferring minors to the JDOC. The rules consist of a statement of purpose, a definition section, sections delineating the responsibilities, membership, and meeting schedule of the IRC, and a severability section. The definition section defines the role of the "convener," and it does not appear from our review of the record that Studzinski, the convener in this case, acted other than in accordance with her duties as set forth in the subsequently enacted rule. In the same section, the IRC is defined as a body convened for the purposes of determining whether "[DCFS] lacks adequate facilities to care for and rehabilitate the minor(s)" and whether "placement of [the] minor[s] with the [DOC], subject to certification by the [DOC], is appropriate." Compare 730 ILCS 5/3—10—11(a) (West 1996) (minor may be transferred if "it is determined by [the IRC] that [DCFS] lacks adequate facilities to care for and rehabilitate such minor and that placement of such minor with the [DOC], subject to certification by the [DOC], is appropriate"). The section on the responsibilities of the IRC again echoes the language of section 3—10—11 (whether DCFS lacks "adequate" facilities and placement with the DOC is "appropriate"). The membership section mirrors section 3—10—11 in setting forth the composition of the IRC (one representative of DCFS, one from DOC, an educator and mental health professional jointly selected by DCFS and the DOC). Compare 730 ILCS 5/3—10—11(a) (West 1996). This section does add a provision setting forth the voting requirements necessary for the IRC to reach a decision (consensus or majority rule, each member having one vote, tie votes resulting in a dead measure). Nevertheless, this provision would have changed nothing in this case, inasmuch as all four members of the IRC voted in favor of respondents' transfer.

The only rule that appears to add anything of substance to what is already contained in section 3—10—11 is the meetings section. This section sets forth a nonexclusive list of records that the convener must provide for the members of the IRC to consider in reaching their decision. These records may include: (1) child welfare records, including records of child abuse and neglect reports and investigations; (2) medical records; (3) psychological and psychiatric records; (4) behavioral and/or disciplinary records; (5) educational records, including individual educational plans and records of multidisciplinary staffings; (6) court records, including petitions, social investigations, and dispositional orders; (7) probation records; and (8) criminal history records.

Again, we fail to see how the result here would have been any different had this rule been passed prior to the committee's formation. From the record it appears the members of the IRC relied on many of the same types of records listed in the IRC's subsequently enacted rule. Studzinski, acting as convener, testified she provided the committee with a package of information about both minors obtained from DCFS, including social investigation reports, psychological and psychiatric assessments, school records, and reports from the juvenile temporary detention center (JTDC). Perkins, the JDOC representative, met with the superintendent and intake supervisor of the JTDC, as well as with J.R.'s psychologist, Dr. Janik. Perkins learned Janik met frequently with J.R. due to the minor's aggressive behavior, which required him to be closely watched. She testified she visited T.J. in the JTDC on November 21, 1994, and received a verbal report on T.J.'s behavior while there. She met briefly with T.J. himself and observed him in school as well.

Dr. Barbara Williams, who filled the position of educator on the IRC, also reviewed the minors' records from DCFS. At one meeting, she expressed concern about the lack of recent education information about the respondents. She did some investigating on her own and learned that neither minor had been cooperative with the JTDC staff. Dr. Williams spoke with teachers at the detention center who dealt with respondents. She also received information about the minors' school performance and behavior while in the JTDC from the school's case manager, Judith Adams. She spoke with Dr. Francis Caroll, the principal of the school at the JTDC, about the minors' behavior while at the JTDC. On January 2, 1995, Dr. Williams met with Caroll and two of respondents' teachers a second time to discuss respondents' status.

Velma Williams, the IRC's DCFS representative, testified that she relied upon the packet of information provided by DCFS in assessing the minors' suitability for placement. She then decided that the committee needed a more complete clinical picture of both minors. She sought further information from Dr. Marcus Kersey, a psychiatrist and consultant with the University of Chicago's department of psychiatry. After viewing the respondents' psychological and psychiatric records, Kersey recommended that neuropsychological tests be performed.

Dr. Eugene Griffin, the mental health professional appointed to the IRC, testified he also relied upon various materials provided by DCFS regarding the minors. In reaching his opinion that DCFS lacked adequate facilities and that placement with the JDOC was appropriate, he considered the minors' psychological and psychiatric evaluations, social investigations, school records, and reports from the detention center.

As the foregoing discussion demonstrates, it appears that the primary materials relied upon by each member of the committee were the records provided by DCFS. Inasmuch as the materials provided by DCFS are all listed in the subsequently enacted rules as examples of records which the IRC could consider in reaching a decision on a minor's placement, we do not see how respondents were disadvantaged by the committee's failure to pass rules prior to recommending a transfer of custody in this case.

■ Counsel for T.J. find numerous other faults with the process by which the IRC members reached their decision. The majority of these merit scant attention. T.J. alleges that by relying upon "incomplete, outdated and improper" information, the IRC "arbitrarily" applied section 3—10—11. Specifically, he alleges that the IRC did not have T.J.'s most recent social investigation report or current educational information (including a Multidisciplinary Education Assessment prepared in May 1995), that the committee did not hear sufficient information regarding T.J.'s conduct while at the JTDC, and that the IRC's decision process was "sloppy and arbitrary" insofar as the committee relied in part on certain "newspaper clippings." Regarding the social investigation report, T.J. cites nothing in the record suggesting a more recent report existed or how it would have affected the IRC's decision to his benefit. We also reject T.J.'s contention that the IRC lacked current information regarding his educational status. Perkins testified that she visited T.J. at the detention center on November 21, 1995, and checked on his progress in school while there. Dr. Williams expressed concern about the lack of recent education information on the minors and, in response, visited the JTDC, where she spoke with one of T.J.'s teachers, case manager Adams, and the principal of the school. And while T.J. complains about the IRC's reliance on "newspaper clippings," he fails to cite where in the record they appear, giving us no indication what was contained in the articles, who relied upon them, and the extent to which they were supposedly relied upon by the IRC.

Referring to the committee's actions in this case as "misguided and ill-conceived," counsel for T.J. argue his transfer amounted to a violation of the due process clauses of both the United States and Illinois Constitutions. Respondent begins by asserting that "the members of the IRC did not understand their statutory duties." Picking and choosing his way through the record, he points to several testimonial excerpts where members of the IRC use the term "appropriate" in reference to their analysis of DCFS' facilities or the term "adequate" in reference to possible placement with the JDOC. See 730 ILCS 5/3—10—11(a)(ii) (West 1996) (permitting transfers where

IRC finds "[DCFS] lacks adequate facilities to care for and rehabilitate" a minor and "that placement *** with the [DOC] *** is appropriate"). However, we doubt the fact that various members of the IRC occasionally juxtaposed these two words while testifying signifies a misapplication of section 3—10—11. The two standards are somewhat interrelated, in that the more lacking DCFS' facilities are found to be, the more likely it is that placement of the minor with the JDOC will be appropriate.

Regardless, our reading of the transcript leaves no doubt that the members of the IRC understood their statutory duties. Each and every member of the IRC recognized the two overlapping concerns in this case—the need for highly secure facilities, capable of protecting others from the minors' aggressive and violent behavior, and the minors' need for treatment. For example, the testimony of Dr. Griffin typifies the balancing of these two concerns performed by the IRC. Dr. Griffin explained his recommendation of placement of both minors in the DOC as follows:

"In my working with [DCFS], where we have had other patients and staff injured, it's been with conduct disordered males, and so I have particular safety concerns when you have aggressive males in terms like once you are placing them on a locked unit, you are in effect locking them in with people that they could potentially hurt, and so based on my concerns for safety, I recommend starting with [the DOC] again with treatment because [the DOC] can take certain precautions that locked residential [facilities] can't ***. They would have their own room and the doors are locked at night and residentials, you share rooms, the doors aren't locked, you don't have the staff always present.
***
*** I would recommend a comprehensive overall plan that would include DOC with treatment then progressing to a locked residential [facility], progressing to community treatment and if possible, ideally, progressing back home."

T.J. next argues "DCFS initiated the transfer hearing before a consensus of the IRC had made a final determination," typifying what he refers to as the "reckless manner" in which the IRC proceeded. He bases this argument on the fact that on December 19, 1995, counsel for DCFS informed the trial court that the IRC had already determined that DCFS lacked adequate facilities and that placement with the DOC was appropriate. It is true that regional counsel for DCFS did represent to the trial court, prematurely it turned out, that the IRC had reached a decision on December 19, 1995 (all four members of the IRC did not agree until January 2, 1996, to recommend transfer of the minors). Nevertheless, there are a number of problems with respon-

dent's argument. First, as respondent is surely aware, DCFS had no power to unilaterally initiate and approve a transfer; statutory responsibility for recommending a transfer of a minor from DCFS to the JDOC rested with the IRC, subject to ultimate approval by the trial court. See 730 ILCS 5/3—10—11(a)(1) (West 1996). Thus, the trial court was under no obligation to accept what counsel for DCFS represented as the conclusions and recommendations of the IRC, and, in fact, the trial court in this case did not.

This leads to the second problem with respondent's argument. While mentioning DCFS' premature and apparently unauthorized representation to the court on December 19, counsel for T.J. fail to mention the entire sequence of events, covering several volumes of the record, that then followed. Immediately after the representation by counsel for DCFS, the trial court probed for the specifics of the referral efforts made by DCFS. Apparently annoyed with counsel's lack of information regarding how such a decision had already been made— prior to a motion to transfer even being filed—the trial judge threatened to subpoena all members of the IRC into court herself to get the necessary information. After the judge obtained the names and addresses of all members of the IRC from counsel, the following exchange took place:

"[Counsel for DCFS]: I think things are getting a bit out of hand in the sense that you, your Honor, awarded, you committed both minors to DCFS. Once you did that it is the role and responsibility of DCFS to assess their needs to secure placement. I don't understand how—

THE COURT: Well I feel that it's my job to make sure that DCFS is doing its job and at this point with the information that I have, I don't feel that's being done. You have given me a list of approximately six referrals for one minor, six or seven for both and I know that DCFS, when they send referrals, they usually send out about thirty. *** DCFS in this particular case is not doing what they normally do in other cases.

When I commit minors to DCFS, I feel that it's my responsibility to make sure that DCFS is doing everything that it should do with regards to these two minors and I feel that this is a situation where these minors are not being treated like every other minor that I have committed to DCFS.

[Counsel for DCFS]: And I certainly respect that, Judge. My point being more focused and we have no obligation to provide anything to anyone other than this court should your Honor so request ***.

THE COURT: Well, that is what I am doing now. Maybe we can get the people in court that know what referrals have been made

and why certain referrals were not made in this situation when they are normally made for other minors."

The trial court then ordered a hearing set for January 2, 1996, and asked defense counsel to subpoena the various members of the IRC to testify. On January 2, the motion to transfer T.J. to the DOC was filed, and the cause was continued until January 22. Lasting over six days and consuming five volumes of T.J.'s record on appeal, the transfer hearing commenced on January 22 and included the testimony of Anne Studzinski, Joanne Perkins, Dr. Barbara Williams, Reginald Richardson (administrator of emergency services for DCFS), Velma Williams, and Dr. Eugene Griffin, as well as several witnesses called by both minors. All members of the IRC testified in agreement regarding their decision to recommend transfer of the minors. Thus, while it may be true, as counsel for T.J. have contended, that in some sense "DCFS initiated the transfer hearing before a consensus of the IRC had made a final determination," a look at the record in its entirety reveals the insignificance of the attempted "initiation."

■■■ T.J. next contends section 3—10—11 of the Code is unconstitutionally vague. Specifically, he finds the "adequate" and "appropriate" standards to be unconstitutionally unclear. See 730 ILCS 5/3—10—11(a)(ii) (West 1996) (permitting transfers where IRC finds "[DCFS] lacks adequate facilities to care for and rehabilitate" a minor); 730 ILCS 5/3—10—11(a)(ii) (West 1996) (permitting transfers where IRC finds "that placement *** with the [DOC] *** is appropriate"). We disagree. Viewed from a broad perspective (and regardless of what two adjectives are attached), section 3—10—11 simply requires the IRC to recommend either placement with DCFS or placement with the DOC, two institutions with commonly understood and easily recognized differences in form and function. DCFS operates treatment-oriented facilities, while the focus of the DOC is on security and containment. We doubt that either the IRC or the trial court was incapable of understanding the differences between DCFS and the DOC. Regardless, the terms "adequate" and "appropriate" appear frequently throughout the Children and Family Services Act itself. See 20 ILCS 505/1 (West 1996) ("It is the purpose of this Act to provide for determination for the *appropriate* level of support, from parents given their financial circumstances" (emphasis added)); 20 ILCS 505/5(a)(3)(E), (a)(3)(F) (West 1996) (goals of child welfare services include "placing children in suitable adoptive homes, in cases where restoration to the biological family is not safe, possible or *appropriate*" and "assuring [safe and] *adequate* care of children away from their homes" (emphasis added)); 20 ILCS 505/5(h) (West 1996) ("If the Department finds that there is no *appropriate* program or facility within or avail-

able to the Department for a ward and that no licensed private facility has an *adequate* and *appropriate* program or none agrees to accept the ward, the Department shall create an *appropriate* individualized, program-oriented plan for such ward" (emphasis added)); 20 ILCS 505/5(l) (West 1996) ("the Department may provide *** family preservation services, as determined to be *appropriate* and in the child's best interests" (emphasis added)); 20 ILCS 505/5(1—1) (West Supp. 1997) ("reunification with the family, when safe and *appropriate*," "reasonable efforts are not *appropriate* or have been unsuccessful" (emphasis added)); 20 ILCS 505/5(n) (West 1996) ("The Department may place children under 18 years of age in licensed child care facilities when in the opinion of the Department, *appropriate* services aimed at family preservation have been unsuccessful" (emphasis added)); see also 20 ILCS 505/5(q) (West 1996); 20 ILCS 505/6a(a) (West 1996); 20 ILCS 505/7.2(13) (West 1996); 20 ILCS 505/23 (West 1996); *cf.* 405 ILCS 5/2—102(a) (West 1996) (Mental Health and Developmental Disabilities Code provides for "*adequate* and humane care and services in the least restrictive environment" (emphasis added)); 405 ILCS 5/3—811 (West 1996) (Mental Health and Developmental Disabilities Code requires court to "consider alternative mental health facilities which are *appropriate*" when a person is found subject to involuntary admission (emphasis added)). Suffice it to say we do not find our Children and Family Services Act plagued with the constitutional infirmities complained of here.

Counsel for T.J. also attack the following portion of section 3—10—11 as being "impermissibly vague":

"[If the three conditions in section (a) are met,] *** the Department of Children and Family Services may transfer custody of the minor to the Juvenile Division of the Department of Corrections provided that:

(1) the juvenile court that adjudicated the minor a delinquent orders the transfer after a hearing with opportunity to the minor to be heard and defend; and

(2) the Assistant Director of the Department of Corrections, Juvenile Division, is made a party to the action; and

(3) notice of such transfer is given to the minor's parent, guardian or nearest relative; and

(4) a term of incarceration is permitted by law for adults found guilty of the offense for which the minor was adjudicated delinquent." 730 ILCS 5/3—10—11 (West 1996).

Specifically, T.J.'s counsel argue that "[w]ithout any reference to the scope of the hearing, evidence admissible at the hearing, the burden of proof, or the propriety of joint transfer hearings with co-respondents, the statute must be void for vagueness." We again disagree.

A similar argument was made and rejected by this court in *People v. Murphy*, 102 Ill. App. 3d 448, 430 N.E.2d 94 (1981). In *Murphy*, the juvenile defendants were tried as adults and convicted of the crimes of rape, deviate sexual assault, armed robbery, and aggravated kidnapping. Defendants were sentenced to the DOC for 14 years on each charge, to run concurrently. When defendants reached the age of 17, the State filed petitions to transfer them from the Illinois Youth Center in Joliet to the adult division of the DOC, pursuant to sections 3—10—7(a) and 5—8—6(c) of the Code (Ill. Rev. Stat. 1979, ch. 38, pars. 1003—10—7(a), 1005—8—6(c) (now 730 ILCS 5/3—10—7(a), 5—8—6(c) (West 1996)). At the time, these statutes provided as follows:

"§1003—10—7. Interdivisional Transfers. (a) In any case where a juvenile was originally committed to the Juvenile Division under Section 5—8—6, the Department of Corrections shall, within 30 days of the date that the juvenile reaches the age of 17, send formal notification to the sentencing court and the State's Attorney of the county from which the juvenile was sentenced indicating the day upon which the juvenile offender will achieve the age of 17. Within 90 days of receipt of that notice, the sentencing court shall conduct a hearing to determine whether or not the juvenile shall continue to remain under the auspices of the Juvenile Division or be transferred to the Adult Division of the Department of Corrections." Ill. Rev. Stat. 1979, ch. 38, par. 1003—10—7.

"§1005—8—6. Place of Confinement. ***

***

(c) *** The committing court shall retain jurisdiction of the subject matter and the person until he or she reaches the age of 21 unless earlier discharged. However, upon request of the Juvenile Division of the Department of Corrections after a person has reached 17 years of age, the court may conduct a hearing with opportunity to the offender to be heard and defend and order the person transferred or committed to the Adult Division of the Department of Corrections." Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—6.

At the hearings conducted pursuant to these sections, the State introduced evidence of the defendants' escape attempts, fighting with other students, and failure to obey staff members. *Murphy*, 102 Ill. App. 3d at 450. Following the hearing, the trial court ordered both defendants transferred. On appeal, the defendants alleged both sections were unconstitutionally vague "because they fail[ed] to provide standards to guide judicial discretion." *Murphy*, 102 Ill. App. 3d at 451.

The *Murphy* court rejected this argument. The court began by noting that juvenile dispositional hearings " 'must measure up to the

essentials of due process and fair treatment' " (*Murphy*, 102 Ill. App. 3d at 451, quoting *Kent v. United States*, 383 U.S. 541, 562, 16 L. Ed. 2d 84, 98, 86 S. Ct. 1045, 1057 (1966)), and that the standard for determining due process requirements in juvenile proceedings is one of fundamental fairness. *Murphy*, 102 Ill. App. 3d at 451. The court then looked to two decisions of the United States Supreme Court, *Kent*, 383 U.S. at 562, 16 L. Ed. 2d at 97-98, 86 S. Ct. at 1057-58, and *Breed v. Jones*, 421 U.S. 519, 44 L. Ed. 2d 346, 95 S. Ct. 1779 (1975):

> "The court, in *Kent*, considered as constitutional juvenile statutes which afford a judge a 'substantial degree of discretion as to the factual considerations to be evaluated, the weight to be given them and the conclusion to be reached.' [Citation.] Although the juvenile transfer statute under scrutiny in *Kent* contained suggested criteria for transferring juveniles to adult court, subsequently in [*Breed*], the court, after pointing out that flexibility and formality are the unique goals of the juvenile system, stated that 'the Court has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court.' Such language leads us to conclude that a precise set of criteria is not constitutionally compelled nor in line with the goals of the juvenile court system." *Murphy*, 102 Ill. App. 3d at 452.

The court went on to note the seriousness of the transfer in *Kent*, inasmuch as that case involved the transfer from juvenile court to a court of general criminal jurisdiction and not merely, as in the case before the court, a dispositional hearing to transfer a juvenile from a youth correctional center to an adult facility:

> "The need for criteria in interdivisional transfer hearings such as in the instant case is considerably less, since guilt has already been determined and the sole question left to the discretion of the court under the statutory provisions concerns whether the juvenile's behavior is such that he should be transferred to an adult institution. The circumstances of each such case will necessarily differ substantially, and the necessary facts potentially bearing on the decision to transfer could not, practically speaking, be specifically identified by statute. *** It appears to us that the legislature intended only that the court act fairly and impartially with regard to the decision to transfer a juvenile to adult facilities under the transfer sections in question." *Murphy*, 102 Ill. App. 3d at 452.

The *Murphy* court concluded that neither section was unconstitutionally vague. *Murphy*, 102 Ill. App. 3d at 452.

We agree with the analysis set forth by the court in *Murphy* and find it equally applicable here. As did section 5—8—6(c), section 3—10—11 of the Code provides an "opportunity" for the minor "to be

heard and defend" (see 730 ILCS 5/3—10—11(1) (West 1996)), and the minor's parent or guardian is given notice of the proceedings (see 730 ILCS 5/3—10—11(3) (West 1996)). The basic requirements of procedural due process are notice and an opportunity to be heard and defend in an orderly proceeding adapted to the nature of the case. *In re J.M.*, 170 Ill. App. 3d 552, 564, 524 N.E.2d 1241 (1988). Adequate notice to the minor and his parents is a requirement of due process in a juvenile proceeding. *J.M.*, 170 Ill. App. 3d at 564. As in *Murphy*, due process does not require a mathematical formula to guide judicial discretion at juvenile dispositional hearings. *Murphy*, 102 Ill. App. 3d at 451.

█ In a related argument, counsel for T.J. contend the IRC "arbitrarily" determined that DCFS lacked adequate facilities for T.J.'s placement. Again, to the extent that the IRC could issue nothing more than a recommendation that the trial court was free to accept or reject (see 730 ILCS 5/3—10—11(a)(1) (West 1996)), this argument is essentially moot. Rather than addressing the arbitrariness of a recommendation, we will address T.J.'s argument, raised later, that the trial court abused its discretion in ultimately granting his transfer. See *In re J.C.*, 260 Ill. App. 3d 872, 884, 632 N.E.2d 127 (1994) (disposition of a minor rests within the sound discretion of the trial court).

Briefly summarized, the trial court heard the following evidence relating to the IRC's recommendation that respondents be placed with the JDOC. As quoted earlier, Dr. Griffin testified he recommended against initial placement in locked residential facilities since in such facilities rooms would be shared, doors would not be locked at night, and staff would not always be present. Dr. Griffin found residential facilities in Illinois to be unacceptable because the Illinois Mental Health and Developmental Disabilities Code did not allow for private rooms that could be locked at night. He ruled out psychiatric hospitals on the basis that no diagnoses of mental illness had been made and that it made no sense to confine someone without a mental illness to such a hospital simply for security purposes. He explained that placement in the JDOC would be just a first step in the minors' rehabilitation, with the minors eventually being transferred to locked residential facilities, community treatment, and then home as they progressed.

Velma Williams noted the repetitive incidents of fighting appearing throughout the record on T.J., fighting which continued throughout his time at the detention center. In determining placement with DCFS would not be adequate, Williams considered T.J.'s numerous "station adjustments," which included adjustments for shoplifting, criminal damage to property, theft, possession of firearms, possession of ammunition, and participation in setting fire to a jail cell while in police

custody (later evidence revealed eight station adjustments in the eight-month period prior to T.J.'s arrest). To Williams, T.J. seemed impulsive and aggressive, showing no signs of remorse, all of which made him a danger to others. She learned from a report from his mother that T.J. was constantly running away. His mother acknowledged the constant fighting and encounters with law enforcement, and she admitted the family had a hard time controlling T.J. Other members of the IRC also expressed concern with T.J.'s fighting while in the detention center.

Reginald Richardson testified regarding the process by which DCFS attempts to place children in its custody. He testified the resources unit of DCFS typically receives an extensive packet of clinical information on each child it is attempting to place (apparently the same packet that each individual member of the IRC was given by DCFS). This packet includes current psychological, psychiatric, and intelligence evaluations, reports from psychiatrists or discharge summaries, social histories from the court or DCFS, court orders granting DCFS guardianship, medical information, school records, physical examinations, and important documents such as birth certificates. Based upon the information assembled, including the child's age, IQ, behavioral problems, criminal history, and time for placement, a data form is developed and plugged into a computerized system, which then searches an electronic database listing residential facilities across the country with which DCFS has contractual relations. The computer system suggests facilities which might accept the child in question, and referral packets are sent to those facilities asking them to review the appropriateness of the child's admission to that facility.

In regard to T.J., a search of the residential facility database, based upon T.J.'s data profile, identified only one facility, Indian Observation, that might accept T.J. Despite this fact, DCFS personnel prepared five referral packets in an attempt to place T.J. Packets were sent to Charter Kingswood in Michigan City, Indiana; Indian Observation in Illinois; Westbridge Treatment Facility in Phoenix; Rebound High Plains Youth Center in Colorado; and Evangelical Children's Home in St. Louis. Richardson testified that upon viewing T.J.'s clinical material, DCFS staff doubted that they could find any facility that would accept T.J. Knowing that they were, however, obligated to make an attempt at placement, the resource unit selected facilities that had, in the past, accepted children with some delinquency problems (although not with delinquency problems as severe as T.J.'s). When asked why no more than five packets were sent out on T.J.'s behalf, Richardson testified that sending out more would have been "fruitless," given the fact that T.J. had been adjudicated delinquent of first degree murder.

Richardson explained why none of the five facilities were acceptable. Charter Kingswood was rejected because it was a hospital facility, and Richardson noted that the facility was "currently on hold from accepting DCFS referrals." Rebound High Plaines Youth Center conditionally accepted T.J., but Richardson explained that the facility was closed and "no longer an option to DCFS wards." Evangelical Children's Home had no openings at the time. Westbridge would not accept T.J. The one Illinois facility, Indian Observation, was neither locked nor secure.

Richardson went on to explain the differences between child welfare facilities and correction facilities in terms of structure and staffing. He explained that the residential programs with which DCFS had contracts focused their care on children with minor behavioral problems and were not equipped to deal with risks of severe violence. Correctional facilities could better prevent "elopement" (runaways), and T.J. had a problem with running away from home. Richardson believed the abused and neglected children normally found at treatment centers to be particularly at risk from children such as T.J., with his history of impulsive behavior and violence.

Also, the trial court heard considerable evidence of T.J.'s propensity for violence. A 1993 psychologist's report indicated that respondent possessed "an explosive temper that is displayed whenever demands are made by authority figures, whenever limits are set, and whenever there is a conflict with peers." T.J. apparently exhibited such a temper while he was being held in the JTDC. A rule violation report dated October 30, 1994, indicated T.J. was asked to stop flashing gang signs, refused, and then hit another resident. On December 4, T.J. was observed fighting with another resident. On January 30, 1995, respondent verbally assaulted staff members after being told to quit banging on his door. On February 28, T.J. was again reported for fighting with another resident. On June 14, respondent was observed throwing gang signs, after which all residents were asked to stand next to the wall. T.J. then hit another resident, and, in the process of being confined, was described as "very hostile and disrespectful towards staff." On July 16, T.J. was observed picking up a chair and attempting to hit another resident. On July 21, T.J. was reported for tossing his food all over the room, after which time he attacked a staff member with a spoon, later becoming "very hostile" and using profanity toward the staff. The next day he again became aggressive and tossed food all over his room, and a notation added to this report indicated "[T.J.] has been getting more and more enraged with himself, with his fellow residents, and with attending staff. Therefore, if his anger isn't somehow extinguished, there is a strong possibility he may harm

himself or others." On September 6, T.J. refused to give his fork back at lunch time, and a later search of his room turned up the hidden fork. On October 10, T.J. was placed in confinement after he began beating on his door and refused to stop. On October 13, T.J. was reported for fighting with another resident over a game of checkers. On October 24, T.J. cursed at staff members and was described as "insolent, belligerent, and defiant." T.J. and another resident were observed fighting in the dining area on November 3. On December 1, a month before the transfer hearing took place, T.J. was reported for fighting with another resident in the television area. T.J. was removed from the group, and a note on the report indicated "[T.J.] is constantly picking at the other residents causing such incidents to occur." On December 6, T.J. was involved in a verbal confrontation with another resident, and shoving soon ensued. Finally, on January 19, 1996, three days before the transfer hearing commenced, T.J. was again reported for fighting.

According to Richardson, if T.J. became violent while at a child welfare facility that contracted with the State, that facility could terminate its contract on 14 days' notice and discharge T.J. back to DCFS. In that event, T.J. would come back to Chicago and be placed in a shelter, if no other facility could be found to accept him within those 14 days. When asked whether, based upon T.J.'s initial placement search and clinical analysis, another facility willing to accept T.J. could be found within 14 days of his discharge, Richardson replied, "Absolutely not." Thus, a real possibility would exist that T.J. could end up at the Cook County Emergency Reception Center, a shelter run by Maryville Academy. He described the shelter as an "open setting" handling approximately 500 children per month, many of whom have just been taken away from their parents and are awaiting emergency placements.

Counsel for T.J. do not point to any evidence in the record suggesting placement with a facility other than the JDOC was available. Yet the trial court did hear some evidence regarding other placement that might be available. T.J.'s probation officer, Augustus Sanford, testified on his behalf. He testified that he located two residential treatment facilities willing to accept T.J.: Charter Behavioral Health Systems at Manatee Palms in Florida and Rebound High Plaines Youth Center in Colorado. However, Sanford acknowledged placement with Rebound was not, at the time, considered acceptable, since that facility had been closed to wards of DCFS. He recommended that T.J. be placed at the Charter facility in Manatee Palms, although the State had earlier elicited testimony that DCFS had prior problems with sexual assaults or improper sexual contact between residents at Manatee.

While the trial judge did express some early concerns about DCFS' efforts to place T.J. somewhere other than the JDOC, those concerns seem to have been assuaged by later testimony. Given the evidence of T.J.'s aggressive and violent behavior (especially while in the JTDC), his history of running away, the nature of the offense committed, and the documented efforts of DCFS in this case, we are not prepared to say the trial judge abused her discretion in approving the recommendation of the IRC.

J.R. has not contended that his transfer to the JDOC amounted to an abuse of discretion by the trial judge, and, therefore, we have not discussed the evidence in the record which supports his transfer. Nevertheless, the record before us is replete with evidence suggesting J.R.'s placement with the JDOC was also appropriate. Indeed, it appears from the record that J.R. was the more troublesome child and presented an even greater danger of ongoing aggression and violence. J.R. had a similar number of "station adjustments" as did T.J., and, in fact, J.R. was on home confinement when he was arrested for first degree murder. While T.J. had approximately 20 disciplinary violations while at the JTDC, J.R. had over 60. Without going into great detail, these included urinating on another resident, throwing bricks at another resident, fighting, and being caught with a shank or knife in his pocket. At one point J.R.'s bed frame had to be removed from his room because he was trying to use it to break the glass out of his door frame. In sum, the trial court heard even more evidence supporting J.R.'s transfer to the JDOC than it did regarding T.J.

T.J. next argues that section 3—10—11 of the Code "should be construed to effectuate the fundamental juvenile court principle of care for and rehabilitation of the minor." In the course of this "argument," he urges that "the actions of DCFS, DOC, the interagency review committee, and the trial court in applying" section 3—10—11 of the Code "must be scrutinized carefully." For what we are not told. In fact, this does not appear to be a legal argument at all but rather a generalized plea for compassion on T.J.'s behalf. No specific error by the trial court is complained of nor any legal authority cited. To the extent respondent suggests the JDOC serves no rehabilitative function, that suggestion has been rejected by our supreme court in the past. See *People v. S.L.C.*, 115 Ill. 2d 33, 46, 503 N.E.2d 228 (1986) (rejecting the argument "that commitment of a delinquent minor to the Department [of Corrections] for a determinate term impedes *** [the] fulfill[ment of] the purpose of the Juvenile Court Act—that of rehabilitation—and substitutes the principle of incarceration for rehabilitation"). *While* we have regard for the general propositions set forth in this "argument," we move on to the minors' next contention.

Both T.J. and J.R. argue that their transfers to the JDOC, pursuant to an amendment to section 3—10—11 of the Code, violated the *ex post facto* clauses of the United States and Illinois Constitutions. See U.S. Const., art. I, §§ 9, 10; Ill. Const. 1970, art. I, § 16. Prior to the date of the instant offense, no juvenile under the age of 13 could be committed to the JDOC. See 705 ILCS 405/5—23(1)(b) (West 1994) ("A minor found to be delinquent may be committed to the Department of Corrections, Juvenile Division, *** if the minor is 13 years of age or older ***"). But *cf.* 730 ILCS 5/3—10—11(a) (West 1994) ("If *a minor *** is adjudicated a delinquent *** and placed with [DCFS], *** [DCFS] may transfer custody of the minor to the Juvenile Division of the Department of Corrections ***") (emphasis added). At the time of Eric's murder, J.R. was 10 and T.J. was 11. Section 3—10—11 was amended, effective January 1, 1995, to permit the transfer of minors as young as 10 to the JDOC. See Pub. Act 88—680, § 45—910, eff. January 1, 1995 (amending 730 ILCS 5/3—10—11 (West 1994)). Since the instant offense occurred on October 13, 1994, respondents argue application of the amended version of section 3—10—11 to them was unconstitutional.

■ The *ex post facto* prohibition of the Illinois Constitution has been read consistently with its federal counterpart. *Fletcher v. Williams*, 179 Ill. 2d 225, 229, 688 N.E.2d 635 (1997); *Barger v. Peters*, 163 Ill. 2d 357, 360, 645 N.E.2d 175 (1994). But *cf. People v. Krueger*, 175 Ill. 2d 60, 74, 675 N.E.2d 604 (1996). Under either provision, a criminal law will be invalidated if: (1) it is retrospective, *i.e.*, it applies to events occurring prior to its enactment; and (2) it falls into one of the traditional categories of prohibited criminal laws. *Fletcher*, 179 Ill. 2d at 230. These traditional categories include any statute that punishes as a crime a previously committed act, innocent when done; laws that make the punishment for a crime more burdensome after its commission; and statutes that deprive one charged with a crime of any defense available at the time when the act was committed. *Fletcher*, 179 Ill. 2d at 229; *Collins v. Youngblood*, 497 U.S. 37, 41, 111 L. Ed. 2d 30, 38, 110 S. Ct. 2715, 2718 (1990); see also *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L. Ed. 648, 650 (1798). The question in the present case is whether the amendment to section 3—10—11 "make[s] the punishment for a crime more burdensome after its commission."

■ Initially, we note T.J. fails the first test in attempting to prove he was the victim of an *ex post facto* law, *i.e.*, that the amendment to section 3—10—11 was retrospective as applied to him. Both respondents were adjudged wards of the court, ordered to complete five years' probation, and committed to DCFS in November 1995. The order committing them to the JDOC was not entered until January 29, 1996. As

of that date, T.J. was 13 years old and, therefore, eligible for commitment to the DOC under either version of the law. As the Attorney General has correctly pointed out, our supreme court has held that the relevant date for purposes of determining a minor's eligibility for placement in the DOC is the date of the dispositional order. See *In re Griffin*, 92 Ill. 2d 48, 50-53, 440 N.E.2d 852 (1982) (finding the only requirement for commitment to the DOC is that the minor be 13 years at the time the order of commitment is entered); see also *In re C.D.*, 198 Ill. App. 3d 144, 145, 555 N.E.2d 751 (1990). T.J., like the minor in *Griffin*, was 13 at the time the order committing him to the DOC was entered, and his age at the time of the offense, therefore, was irrelevant. See *Griffin*, 92 Ill. 2d at 53 (rejecting "[t]he argument that our holding will promote prosecutorial delays that are unnecessary, contrived, and in bad faith," since "[a]n adequate safeguard against such delays *** will be the trial court's sophisticated scrutiny of the ground for requests for continuance"). Thus, no change in the law was retroactively applied to T.J., and his *ex post facto* argument was properly rejected by the trial court.

■ Regardless, neither respondent provides us with any relevant case law supporting their contention that the change in section 3—10—11 of the Code permitting their transfers to the JDOC "increases the penalty by which a crime is punishable." See *California Department of Corrections v. Morales*, 514 U.S. 499, 506 n.3, 131 L. Ed. 2d 588, 595 n.3, 115 S. Ct. 1597, 1602 n.3 (1995); see also *Collins*, 497 U.S. at 43, 111 L. Ed. 2d at 39, 110 S. Ct. at 2719 (holding "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts"); *Fletcher*, 179 Ill. 2d at 234. The State maintains the protections of the *ex post facto* clauses do not extend to juveniles, inasmuch as "the Juvenile Court Act serves a rehabilitative function and lacks any punitive purpose." We believe, however, that the *ex post facto* clause is applicable to juvenile proceedings, regardless of the labels attached to them. See, *e.g., Virgin Islands v. D.W.*, 3 F.3d 697, 701 (3d Cir. 1993) (finding retroactive imposition of fine on juvenile violated *ex post facto* principles, rejecting government's argument that "because juvenile proceedings serve a rehabilitative rather than a punitive function, any increase in punishment is outside the purview of the Ex Post Facto Clause"); *Commonwealth v. Kelley*, 411 Mass. 212, 216, 581 N.E.2d 472, 474-75 (1991) (striking down retroactive extension of juvenile's commitment, despite acknowledging that "the juvenile justice system is not a penal system"); *United States v. Juvenile Male*, 819 F.2d 468, 470-71 (4th Cir. 1987) (amendment to Juvenile Delinquency Prevention Act (42 U.S.C. § 3801 *et seq.* (1994)) authorizing prosecution of 15-year-old offenders as adults violated *ex*

122

*post facto* clause where applied retroactively to juvenile, despite claim law was merely procedural); *In re Appeal in Maricopa County Juvenile Action No. J—92130*, 139 Ariz. 170, 173, 677 P.2d 943, 946 (Ariz. App. 1984) (invalidating retroactive application of amendment authorizing juvenile court to impose monetary assessment and order restitution when committing delinquent minor to Department of Corrections, noting "the mere fact that the focus of juvenile dispositions is on rehabilitation as a policy is not dispositive of the constitutional question"); *Johnson v. Morris*, 87 Wash. 2d 922, 928-29, 557 P.2d 1299, 1304-05 (1976) (retroactive statute extending juvenile court jurisdiction over delinquent juveniles from age 18 to age 21 violative of *ex post facto* clause, despite State's argument that "extension of jurisdiction was not intended to punish this juvenile but rather to provide further drug/alcohol counseling and treatment"); *In re Valenzuela*, 275 Cal. App. 2d 483, 486-87, 79 Cal. Rptr. 760, 763 (1969) (retroactive statute authorizing continuation of juvenile's confinement beyond original discharge date invalid despite government's objection that the new statutory procedures were "civil rather than criminal, rehabilitative rather than punitive"); *cf. Breed v. Jones*, 421 U.S. 519, 529, 44 L. Ed. 2d 346, 355, 95 S. Ct. 1779, 1785 (1975) ("[D]etermining the relevance of constitutional policies, like determining the applicability of constitutional rights, in juvenile proceedings, requires that courts eschew 'the "civil" label-of-convenience which has been attached to juvenile proceedings,' *** and that 'the juvenile process *** be candidly appraised' "), quoting *In re Gault*, 387 U.S. 1, 50, 21, 18 L. Ed. 2d 527, 558, 542, 87 S. Ct. 1428, 1455, 1440 (1967); *People ex rel. Carey v. Chrastka*, 83 Ill. 2d 67, 77-78, 413 N.E.2d 1269 (1980) (analyzing Habitual Juvenile Offender Act (Ill. Rev. Stat., 1979 Supp., ch. 37, par. 705—12) for *ex post facto* violations).

■ Retroactive laws that are alleged to have worked an increase in punishment frequently alter one of two aspects of an individual's confinement: the length of the confinement or the conditions of the confinement. Any retroactive lengthening of an individual's incarceration, regardless of degree, will unfailingly draw a successful constitutional attack. See, *e.g., Kelley*, 411 Mass. 212, 581 N.E.2d 472; *Johnson*, 87 Wash. 2d 922, 557 P.2d 1299; *Valenzuela*, 275 Cal. App. 2d 483, 79 Cal. Rptr. 760. In fact, it is not necessary that the length of the defendant's sentence be extended; it is enough that the opportunity for parole or early release be curtailed. Compare *Lynce v. Mathis*, 519 U.S. 433, 137 L. Ed. 2d 63, 117 S. Ct. 891 (1997) (statute canceling early release credits for certain classes of prisoners held to be invalid *ex post facto* law), and *Weaver v. Graham*, 450 U.S. 24, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981) (striking down law that reduced formula for

calculating future gain time credits), with *California Department of Corrections v. Morales*, 514 U.S. 499, 509, 131 L. Ed. 2d 588, 597, 115 S. Ct. 1597, 1603 (1995) (amendment to parole procedures that decreased the frequency of parole hearings for certain offenders not prohibited on *ex post facto* grounds, since change in law created only "speculative and attenuated possibility" of increasing punishment). In such cases, a violation may be found even if there is no punitive purpose behind the change in the law; where a statute objectively lengthens the period an individual must spend in prison, the legislature's subjective intent in passing the law is irrelevant. *Lynce*, 519 U.S. at 441, 137 L. Ed. 2d at 72, 117 S. Ct. at 896. The State correctly points out that neither minor's sentence (five years' probation, before and after the amendment to section 3—10—11) was lengthened in this case. However, that does not end the inquiry.

A law may also retroactively alter the conditions of an individual's confinement to such a degree that it falls within the prohibitions of the *ex post facto* clause. See *In re Medley*, 134 U.S. 160, 33 L. Ed. 835, 10 S. Ct. 384 (1890). In *Medley*, the Court was faced with an amendment to a Colorado statute which required that a death row inmate be kept in solitary confinement until the time of his execution. The previous law contained no such provision, and the law was retroactively applied to petitioner. Rejecting the State's argument that the change in the law was "a mere unimportant regulation as to the safe-keeping of the prisoner," the Court recounted the history of solitary confinement in connection with the death penalty and concluded the Colorado legislature could only have had a punitive purpose in mind when it enacted the statute. *Medley*, 134 U.S. at 167-68, 33 L. Ed. at 888-89, 10 S. Ct. at 386. Since the law was punitive in both purpose and effect, the Court found the law imposed "an additional punishment" in violation of the *ex post facto* clause. *Medley*, 134 U.S. at 171, 33 L. Ed. at 840, 10 S. Ct. at 387.

Since *Medley*, however, inmates have had remarkably little success when challenging retrospective changes in the conditions of their confinement on *ex post facto* grounds. These changes are typically viewed as matters relating to penal administration or prison regulation, devoid of punitive purpose, and, therefore, beyond the purview of the *ex post facto* clause. See *Knox v. Lanham*, 895 F. Supp. 750, 756-58 (D. Md. 1995) (noting "[a] number of cases have held that security classification decisions concern 'internal administration of a prison,' and are not punitive such as to violate the Ex Post Facto Clause"); *Neal v. State*, 180 Ark. 333, 338, 21 S.W.2d 864, 866 (1929) (holding that changes related to prison discipline or penal administration do not raise *ex post facto* concerns, even though they may operate to

increase the severity of the punishment of the inmate); *cf. Morales*, 514 U.S. at 510 n.6, 131 L. Ed. 2d at 597 n.6, 115 S. Ct. at 1603 n.6 (*ex post facto* clause does not "require that the sentence be carried out under the identical legal regime that previously prevailed"). Retroactive reduction or curtailment of furlough, temporary and work release privileges are generally upheld on this basis. See, *e.g., Lee v. Governor of New York*, 87 F.3d 55, 59-60 (2d Cir. 1996) (legislation rendering certain prisoners ineligible for temporary release was "simply a change in the legal regime and [was] not an increase in punishment," noting "there is no allegation that plaintiffs' eligibility for or participation in a temporary release program would have any effect on the length of their sentences"); *DiStefano v. Watson*, 566 A.2d 1, 8 (Del. 1989) (upholding amendment rendering prisoners generally ineligible for any furlough or work release program during the first 10 years of their confinement); *Milhouse v. Levi*, 548 F.2d 357, 363-64 (D.C. Cir. 1976) (holding Attorney General's order curtailing furlough privileges was not an *ex post facto* law, since "[a] furlough program, unlike parole, *** is an internal rehabilitational program the denial of which cannot be said to be an element of the punishment attached to an inmate's initial conviction"); *cf. Vargas v. Pataki*, 899 F. Supp. 96, 99 (N.D.N.Y. 1995) (law prohibiting inmates convicted of homicide from participating in work release program not *ex post facto* law).

Closely related are changes in the law affecting an inmate's security classification, resulting in more restricted and burdensome conditions of confinement. These changes are frequently upheld against *ex post facto* attack on the same basis. In *Dominique v. Weld*, 73 F.3d 1156 (1st Cir. 1996), a new Massachusetts law made convicted sex offenders ineligible for a minimum security facility unless and until the offender successfully completed a treatment program, admitted his offense, and otherwise obtained approval for a transfer. Plaintiff, a convicted sex offender, was returned to confinement after he had been allowed to participate in a work release program for almost four years. Noting that there was "a considerable difference between the freedoms Dominique enjoyed when he was in work release status and the conditions of incarceration at a medium security facility" (*Dominique*, 73 F.3d at 1160), the court nevertheless found no *ex post facto* violation:

> "It can be argued that the regulation increases the penalty because it subjects Dominique to a different and stricter prison regime: unless and until he successfully completes the prescribed treatment program and admits to a crime he continually has denied, he must remain confined at no less than a medium security facility and remain ineligible for privileges associated with lower security imprisonment. We conclude, however, that this change in the condi-

tions determining the nature of his confinement while serving his sentence was an allowed alteration in the prevailing 'legal regime' rather than an 'increased penalty' for ex post facto purposes." *Dominique*, 73 F.3d at 1163, quoting *Morales*, 514 U.S. at 510 n.6, 131 L. Ed. 2d at 597 n.6, 115 S. Ct. at 1603 n.6.

The court further remarked that the change in the law did not affect the length of plaintiff's sentence or his parole options. *Dominique*, 73 F.3d at 1163.

Other, similar changes to regulations involving prison security have been upheld. In *Payton v. Fiedler*, 860 F. Supp. 606 (E.D. Wis. 1994), plaintiff was found to be ineligible for minimum security based upon amended regulations that came into effect long after his offense and conviction. In *Dyke v. Meachum*, 785 F.2d 267 (10th Cir. 1986), a new state policy required prisoners to serve 20%, rather than 10%, of their sentences to become eligible for reclassification to minimum security status. And in *Neal*, an inmate argued that he had pled guilty with the assurance that he would not serve his time in the penitentiary, but, rather, on the "road district," where, he argued, "he would not have to wear stripes, where health conditions were better ***, where he could see his friends and relatives often, where the hours of service were not as long, and where he would not be compelled to serve with criminals convicted of graver offenses." *Neal*, 180 Ark. at 336, 21 S.W.2d at 865. In all three cases, the courts rejected *ex post facto* challenges to the changes in conditions. *Payton*, 860 F. Supp. at 608; *Dyke*, 785 F.2d at 268; *Neal*, 180 Ark. at 338, 21 S.W.2d at 866; see also *Glynn v. Auger*, 678 F.2d 760, 761 (8th Cir. 1982) (institution of "double celling"—placing two inmates in a single cell—did not violate *ex post facto* clause).

■ In light of these cases, we believe the amendment to section 3—10—11 is more properly viewed as a security classification provision, integral to the juvenile detention system, than as an increase in punishment, violative of the *ex post facto* clause. Like many of the inmates in the cases previously discussed, respondents have simply been transferred to a more secure facility from a less secure one. While respondents may now be exposed to "a different and stricter prison regime" (see *Dominique*, 73 F.3d at 1163), such a change in the "legal regime" is permissible. See *Morales*, 514 U.S. at 510 n.6, 131 L. Ed. 2d at 597 n.6, 115 S. Ct. at 1603 n.6. Respondents' sentences have not been extended nor have their opportunities for early release been curtailed. See *Knox*, 895 F. Supp. at 756-58 (change of policy requiring transfer of inmates from minimum security or work release to medium security facility, when combined with unwritten requirement of work release for parole eligibility, constitutes a violation of the *ex post facto* clause).

Moreover, we find no persuasive evidence that the amendment to section 3—10—11 serves a punitive purpose. *Cf. Medley*, 134 U.S. at 171, 33 L. Ed. at 840, 10 S. Ct. at 387 (suggesting that, to rise to the level of an *ex post facto* violation, a change in conditions of confinement—unlike an alteration in the *length* of confinement—must be imposed for a punitive purpose). Counsel for J.R. points to various comments from the legislative debates surrounding Public Act 88—680 (especially comments from those opposing the bill) in support of the contention that there was a punitive purpose behind the changes to section 3—10—11. Most of these comments reflect legislators' concerns over the prospects of minors receiving necessary treatment while in the JDOC. Nevertheless, concern over the rehabilitative potential of the JDOC, however reasonable, does not prove a punitive purpose behind section 3—10—11.

It is clear that the amendment to section 3—10—11 permitting the transfer of juveniles 10 or older to the JDOC was not designed to be punitive in operation. If our legislature had set out with a punitive design in mind, that section could have just as easily been drafted so that placement with the JDOC was *mandatory* whenever children 10 or older commit murder. That was not done. Instead, a statutory scheme was passed that created an independent administrative body that could only *recommend* placement in the JDOC, subject to approval by the trial court (with review as a matter of right by this court).

Foremost among the concerns of the *ex post facto* clause are "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver*, 450 U.S. at 30, 67 L. Ed. 2d at 24, 101 S. Ct. at 965; accord *Lynce*, 519 U.S. at 441, 137 L. Ed. 2d at 72, 117 S. Ct. at 896; *Fletcher*, 179 Ill. 2d at 230. When respondents dropped Eric Morris from that abandoned fourteenth-floor apartment, they had fair warning that they could be placed on probation for five years and confined against their will. Where they might be confined, there was no constitutional guarantee.

The Supreme Court has retreated from earlier opinions suggesting that changes affecting punishment automatically fall within the *ex post facto* prohibition if they operate to the "disadvantage" of covered offenders. See *Morales*, 514 U.S. at 506 n.3, 131 L. Ed. 2d at 595 n.3, 115 S. Ct. at 1602 n.3. As the Court has clarified, "the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' *** but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Morales*, 514 U.S. at 506 n.3,

131 L. Ed. 2d at 595 n.3, 115 S. Ct. at 1602 n.3; accord *Fletcher*, 179 Ill. 2d at 234. Legislative enactments are presumed to be constitutional and all reasonable doubts must be resolved in favor of upholding their validity. *People v. Davis*, 177 Ill. 2d 495, 501, 687 N.E.2d 24 (1997). The party challenging a statute bears the burden of clearly establishing the alleged constitutional violation. *Davis*, 177 Ill. 2d at 501; *Department of Corrections ex rel. People v. Adams*, 278 Ill. App. 3d 803, 807, 663 N.E.2d 1145 (1996). Respondents have not clearly established section 3—10—11, as amended, "increase[d] the punishment for criminal acts." See *Collins*, 497 U.S. at 43, 111 L. Ed. 2d at 39, 110 S. Ct. at 2719.

The trial court found the change to section 3—10—11 did not amount to an *ex post facto* law because it did not increase the length of the minors' confinement; rather, it simply altered the location of their confinement. On the facts now before us, we agree. In fact, when we view respondents' conduct since their findings of delinquency for first degree murder, it is apparent that any placement of these minors would be to a facility providing security similar to that of the JDOC, notwithstanding the goal of rehabilitation with the least restrictive conditions. However, we do not intimate that every alteration in the location of an individual's confinement, short of those that are imposed with a punitive purpose or that shock the conscience (*e.g., Medley*), will escape unscathed from *ex post facto* scrutiny. We merely hold that the more burdensome confinement conditions imposed here do not rise to the level of constitutional significance.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

CAHILL, P.J., and BURKE, J., concur.